**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 22 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

---

ROBERT J. STEELE,

      Plaintiff-Appellant,

v.

THIOKOL CORPORATION,

      Defendant-Appellee,

      and

BRUCE ESPLIN; AL SMART,

      Defendants.

No. 99-4126

---

Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:96 CV 1038C)

---

David J. Holdsworth of Sandy, Utah, for Plaintiff-Appellant.

Darryl J. Lee (Eric T. Johnson with him on the brief) of Wood Crapo LLC, Salt Lake City, Utah, Defendant-Appellee.

---

Before **SEYMOUR**, **KELLY** and **LUCERO**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Robert Steele appeals from the district court's grant of summary judgment to Thiokol Corporation and two individual defendants on his claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 1210. We affirm.

I

Robert Steele began his employment with Thiokol in 1987, working as a Rocket Test Technician in the main plant test area.[1] In 1988, after a year with the company, he was promoted and received a raise. In 1989, Mr. Steele was transferred from the main plant test area to the Hydrotest group. While working in Hydrotest, Mr. Steele was twice promoted on the basis of his performance.

As the district court described the problem,

---

[1] Mr. Steele failed to comply with 10th Cir. R. 10.3(D)(2), which requires inclusion in the record of a copy of the motion for summary judgment made in the district court. He also failed to submit the briefs, memoranda, and points of authority in support of the aforementioned motion for summary judgment, in violation of 10th Cir. R. 10.3(D)(2) and 10.3(E). Mr. Steele apparently would have this Court rely only on a transcript of the summary judgment motion hearing in deciding this appeal.

Notwithstanding the omissions, we obtained the trial motions and briefs from the district court. Appellants should be aware, however, that we are not obligated to comb through the summary judgment record and make a party's case for it by locating materials not referenced by that party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).

"Steele had problems getting along with his co-workers. Hydrotest group members often teased Steele about being stupid. For example, team members would hum 'If I Only Had a Brain,' write 'dunce' on the back of Steele's hard hat, and draw cartoons with Steele's name on them depicting him as the 'big dumb one.' Steele's co-workers also made comments which Steele believed were directed at his mental health. Steele often heard co-workers refer to him as 'Psycho Bob.' Steele overheard one team member say, 'I hope I'm not here or around when Bob loses it,' and another say that he thought Steele was 'crazy as hell. He's a psychopath.' One team member would make cuckoo noises in Steele's presence. Steele also took offense when his supervisor said, 'Robert, what am I going to do with you and Jill?' Jill Hopper was a Thiokol employee who many believed to have mental problems."

App. at 58.

Mr. Steele often complained about his co-workers' behavior to the foreman of the Hydrotest group, Linda Caldwell. He described the above incidents to Ms. Caldwell on many occasions and asked her to intervene. Ms. Caldwell cautioned Mr. Steele that were she to intervene in the situation, it might make matters worse for him because he would be perceived as "a mama's boy" by the other workers in the group. She nevertheless spoke to the crew about the problem. Mr. Steele also informed his supervisor, Bill Clark, that he had a disability but did not request any accommodation or action by the company. Mr. Clark apparently responded to Mr. Steele by saying "Bullshit, you do not have a disability." *Id.* at 174.7. Mr. Steele subsequently requested that Mr. Clark transfer him out of the Hydrotest group and into the Postfire group because he "had had enough abuse." *Id.* at 139-140. Mr. Clark granted his request and Mr. Steele was transferred in August

-3-

1993.

While working in Postfire, Mr. Steele was diagnosed with depression and he began to take Zoloft. In accordance with Thiokol policy, Mr. Steele informed the company nurse that he was taking Zoloft and she, in turn, informed Mr. Clark, Mr. Steele's supervisor, about Mr. Steele's medication. In February 1994, Mr. Clark contacted the company nurse, stating he was "concerned that Robert Steele is showing mood swings, wondered if the medication Zoloft would be the cause." App. at 280. A doctor was consulted and the company nurse told Mr. Clark that "the mood swings and paranoia described are not side effects of Zoloft, perhaps other problems." *Id.*

In December 1994, Mr. Steele spoke with Dave Rutherford, Thiokol's human resources representative, and Greg Kotter, plant manager, concerning his treatment in the Postfire group and the harassment he was experiencing. Mr. Steele told them "that I'd had it. I had gone to various people. I've gone to . . . all these people trying to ask for help." App. at 211. In response, Mr. Kotter prepared a memo which detailed the problems Mr. Steele was having and also what Mr. Steele was doing that was bothering his co-workers. While the memo noted that Mr. Steele was teased more than others on his crew, the memo also stated that Mr. Steele's co-workers believed Mr. Steele was "obsessed" with his planned litigation against Thiokol because he talked about it continually. Mr.

Steele "sometimes threatened to involve his co-workers in the lawsuit and, on one or two occasions, threatened to fight co-workers in the parking lot." App. at 60. Mr. Kotter initiated training for everyone on Mr. Steele's team, including Mr. Steele, about harassment and appropriate conduct in the workplace. He also requested that Mr. Steele refrain from discussing his lawsuit against the company with co-workers during business hours.

In January 1995, Mr. Steele was diagnosed with Obsessive-Compulsive Disorder (OCD) by Suze Harrington, a counselor. As described by the district court,

> "[Mr.] Steele's OCD is exhibited by mannerisms such as walking in the same path and performing jobs in a certain way. Failure to follow these routines causes Steele anxiety and stress and sometimes results in panic attacks. However, Steele's OCD did not interfere with his work except that it sometimes caused him to spend more time performing a task."

*Id.* at 59.

On January 12, Mr. Steele received "Phase I"[2] counseling from Mr. Clark for continuing to discuss his lawsuit with his coworkers despite Thiokol's request that he not do so. On January 23, Mr. Steele received "Phase II" counseling from Mr. Clark because Mr. Steele continued to discuss his litigation with his

---

[2]As the district court explained, "Thiokol refers to its graduated levels of written discipline as 'phases.' Phases are a significant part of the matrix Thiokol uses to select employees for termination during a reduction in force." App. at 60, n.1.

coworkers.

In April 1995, Mr. Steele got into a fight with his team leader, Mr. Anderson, during which Mr. Anderson slapped Mr. Steele. As a result, Mr. Anderson was demoted from his supervisory position, his pay was cut, and he was transferred to the Grit Blast group. Later in the month, Mr. Steele learned that he might also be transferred to the Grit Blast group. He was worried about working in that group because of Mr. Anderson, so he asked Mr. Kotter to transfer him to Tooling Refurbishment instead, a request which was granted.

After beginning work in Tooling Refurbishment, Mr. Steele began experiencing problems with his co-workers similar to those he had experienced before. "Steele's former co-workers told his crew that Steele's nickname was 'Psycho Bob.' After speaking with Steele's former co-workers, a member of the Tooling Refurbishment crew asked Steele 'how Harvey the Rabbit was doing.' Someone also put a sign on Steele's new supervisor's office reading, 'Mental Health Services.'" *Id.* at 59. In December, Mr. Steele received a second Phase II counseling "as the result of two separate altercations with co-workers." *Id.* at 61.

In July 1996, after receiving a Phase III counseling following another argument with a co-worker, Mr. Steele suffered a nervous breakdown and took a three-and-a-half-week leave of absence. A psychiatrist certified that Mr. Steele would be able to return to work on August 12, 1996, which Mr. Steele did.

On September 12, Mr. Steele was terminated from his position "pursuant to a general reduction in force ('RIF')." App. at 61. The decision to terminate Steele was made by his supervisor in Tooling Refurbishment, David Hess, in accordance with Thiokol's RIF policies and procedures. "After considering Steele's work performance and contributions to the team together with his disciplinary history and ability to get along with co-workers, Hess found that Steele was rated lowest within his work group." *Id.*

Mr. Steele brought this action claiming that he had been subjected to a hostile work environment and then terminated in retaliation for complaining about that work environment. The district court granted Thiokol's motion for summary judgment on the hostile work environment, holding that Mr. Steele was not disabled under the ADA. The district court denied Thiokol's summary judgment motion on the retaliation claim, finding "a genuine issue of material fact regarding Thiokol's motivation for Steele's discipline and subsequent termination which precludes summary judgment." *Id.* at 68. Accordingly, the retaliation claim went to a jury, which found in favor of Thiokol and against Mr. Steele. Mr. Steele appeals only the district court's award of summary judgment to Thiokol on the hostile work environment claim.

## II

We review the district court's grant of summary judgment de novo, applying the same legal standard. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56 (c). When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 120 S.Ct. 53 (1999).

Mr. Steele contends the district court erred in holding that a plaintiff bringing a hostile work environment claim under the Americans with Disabilities Act must be disabled and not merely "impaired." Alternatively, he argues the district court erred in concluding he was not disabled by his Obsessive-Compulsive Disorder (OCD) for purposes of the Act. We examine each of these issues in turn.

## III

No federal appellate court has yet directly ruled on whether a hostile work environment claim can even be brought under the ADA. Some circuits have assumed, without deciding, that such an ADA claim is cognizable. *See Walton v. Mental Health Ass'n of S.E. Pa.*, 168 F.3d 661, 666-67 (3rd Cir. 1999); *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998); *Vollmert v. Wis. Dep't of Transp.*, 197 F.3d 293, 297 (7th Cir. 1999); *Silk v. City of Chicago*, 194 F.3d 788, 803-04 (7th Cir. 1999); *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 687-88 (8th Cir. 1998), *cert. denied*, 526 U.S. 1004 (1999). For the reasons set out below, we need not decide whether a hostile work environment claim is viable under the ADA.

### A.    *Must Mr. Steele be disabled and not simply "impaired" to avail himself of the ADA?*

In order to make out a claim under the Americans with Disabilities Act, a plaintiff must demonstrate as a threshold matter that he is a "qualified individual with a disability." 42 U.S.C. §12112(a). Although Mr. Steele conceded below that a person must be disabled to bring a hostile work environment claim under the ADA, he argues on appeal that an "impairment" which falls short of the statutory definition of "disability" is enough. Mr. Steele contends that an "impairment" should be sufficient to satisfy the ADA's threshold test in cases

where the underlying substantive claim is, as here, based on a hostile work environment theory.

Tenth Circuit precedent in this area runs directly counter to Mr. Steele's argument, holding that in order to bring any claim under the ADA, a plaintiff must first establish that he is a qualified individual with a disability. *See Pack v. Kmart Corp.*, 166 F.3d 1300, 1304 (10th Cir.), *cert denied*, 528 U.S. 811 (1999). Mr. Steele cites no case in support of his position, and we have found none. *See, e.g., Walton*, 168 F.3d at 667 (assuming that a hostile work environment claim is cognizable under the ADA, one element of a prima facie case would be the "qualified individual with a disability" standard of the ADA). We decline to extend the reach of the ADA so far beyond its plain language, deferring instead, as we must, to the definition of disability provided in the ADA and its implementing regulations.

**B.     *Is Mr. Steele disabled?***

Mr. Steele alternatively asserts he is disabled within the meaning of the ADA. Disability is defined by the Act as follows:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. §12102(2).  Mr. Steele argues on appeal that he is disabled under each

of these three definitions of disability.  Because he did not contend in the district

court that he had a record of impairment, however, we will not address that issue

here.  *See, e.g., Tele-Communications, Inc. v. Commissioner*, 12 F.3d 1005, 1007

(10th Cir. 1993) ("The general rule is that an appellate court will not consider an

issue raised for the first time on appeal.").

Mr. Steele claims he has "a physical or mental impairment that substantially

limits one or more" of his major life activities, an argument which the district

court rejected.  Although one federal circuit court has found that an individual

with OCD was disabled, the ADA demands that we examine exactly how Mr.

Steele's major life activities are limited by his impairment of OCD.  *See, e.g.,*

*Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir. 1999)(holding plaintiff

disabled because his OCD substantially affected his ability "to eat and drink

without vomiting [and] his ability to concentrate and learn").

The major life activities Mr. Steele identifies on appeal as being

substantially affected by his OCD are sleeping, walking, interacting with others,

and learning/comprehending.[3]  The EEOC regulations governing the ADA identify

---

[3]Mr. Steele does not argue that his ability to work, which is considered a major life activity under the ADA, was substantially limited by his OCD.  In fact, the record reflects that Thiokol accommodated his OCD-related problems by permitting him to make up any time he lost as a result of taking more time to perform certain tasks or arriving to work later when he had trouble sleeping through the night.

walking and learning as examples of major life activities. *See* 29 CFR §1630.2(i).

In addition, we have accepted sleeping as a major life activity, *see Pack*, 166 F.3d

at 1305. We have not decided whether "interacting with others" is a major life

activity and there is a split among the circuits on the issue. *Compare Soileau v.*

*Guilford of Maine, Inc.*, 105 F.3d 12, 15 (1st Cir. 1997) *with McAlindin v. County*

*of San Diego*, 192 F.3d 1226, 1234-1235 (9th Cir. 1999), *cert. denied*, 120 S.Ct.

2689 (2000). We address each asserted major life activity in turn, with the

exception of Mr. Steele's ability to comprehend and learn, which he did not raise

in the district court. *See Tele-Communications, Inc.*, 12 F.3d at 1007.

A person is "substantially limited" in a major life activity if he is:

> (i) Unable to perform a major life activity that the average person in the
> general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under
> which an individual can perform a particular major life activity as compared to
> the condition, manner, or duration under which the average person in the general
> population can perform that same major life activity.

29 CFR §1630.2(j)(1). In determining whether any of Mr. Steele's major life

activities have been affected, the ADA regulations counsel that a court should

also consider the following factors:

> (i) The nature and severity of the impairment;
> (ii) The duration or expected duration of the impairment; and
> (iii) The permanent or long term impact, or the expected permanent or long
> term impact of or resulting from the impairment.

29 CFR §1630.2 (j)(2). We apply these factors to the evidence Mr. Steele

submitted to avoid summary judgment.

## 1.  Sleeping

In *Pack,* we held that sleeping is a major life activity for ADA purposes. *Pack,* 166 F.3d at 1305.  However, we concluded that the plaintiff's disability did not "substantially limit" her sleeping.  Applying the regulations discussed above, we held that "[w]hile the evidence showed Pack had episodes of sleep disruption and/or waking without feeling rested . . . there is no indication that her sleep problems were severe, long term, or had a permanent impact." *Id.* at 1306.

In an affidavit offered in support of his response to Thiokol's summary judgment motion, Mr. Steele asserted that he is often awake for some time in the middle of the night, "which causes me a great deal of fatigue during the day." App. at 274.  He offered no evidence that his sleep problems made it difficult for him to go to work and do his job well or affected his overall health in a severe or permanent manner.  This is virtually identical to the situation presented in *Pack.* Consequently, the district court correctly concluded there was insufficient evidence that Mr. Steele's major life activity of sleeping was sufficiently limiting to survive summary judgment.

## 2.  Walking

There is no doubt that Mr. Steele's patterns of walking are affected by his OCD in sometimes inconvenient ways, as the district court recognized.  To some

extent his OCD inhibits his walking, but we agree with the district court that it cannot fairly be said to substantially limit his ability to walk because he is still physically and psychologically capable of walking. This is not to say that walking may only be limited physically, such as being confined to a wheelchair. A case could be presented where an emotional or mental disorder so affected a person's ability to walk that his walking was substantially limited, by agoraphobia for example. That is not the case here. Mr. Steele failed to present sufficient evidence that his ability to walk was substantially limited as required by the ADA.

### 3. Interacting with others

This court has never decided whether "interacting with others" is a major life activity under the ADA. As we have noted, there is a split among the circuit courts on this question.

The First Circuit has suggested "the ability to get along with others" does not qualify as a major life activity. *Soileau*, 105 F.3d at 15-16. The court held that "the concept of [ability to interact with others] is remarkably elastic, perhaps so much so as to make it unworkable as a definition." *Id.* at 15. Mr. Soileau had dysthymia, "a chronic depressive disorder characterized by intermittent bouts of depression." *Id.* at 14. He claimed this disorder made it hard for him to be in crowded places, such as pubs and stores. The court said "there is nothing extraordinary about preferring uncrowded places. Soileau performed his normal

daily chores, went grocery shopping, and visited pubs." *Id.* at 16. The simple fact that Soileau left such places when they became too crowded did not demonstrate that "the nature and severity of his impairment were substantial." *Id.*

In contrast, the Ninth Circuit has held that "because interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of 'major life activity.'" *McAlindin*, 192 F.3d at 1234. The *McAlindin* court specifically rejected the First Circuit's approach to the issue in *Soileau*, noting that "interacting with others is no more vague than 'caring for oneself,' which has been widely recognized as a major life activity." *Id.* at 1235. Mr. McAlindin suffered from anxiety, panic and somatoform disorders. *Id.* at 1230. His symptoms included "dizziness, lightheadedness, narrowed vision, and strange sensations" in his head, arms and legs, impotence, and severe insomnia and severe anxiety -- even when he was on a regimen of powerful medications. *Id.* at 1230-1231. His ability to see, hear, and speak was affected by his disorders. *Id.* at 1231. In determining whether Mr. McAlindin's ability to interact with others was affected by his disorder, the court pointed out that "there are clinical findings indicating that one of the effects of McAlindin's mental illness is a pattern of withdrawal from public places and family members." *Id.* at 1235.

Comparing the facts of this case to the facts in both *Soileau* and *McAlindin*,

-15-

it is apparent that Mr. Steele's experiences are more akin to those of Mr. Soileau than to those of Mr. McAlindin. Mr. Steele alleges that he had "severe interpersonal problems" with "many of his coworkers," and that his "OCD and depression included behaviors that made him the frequent butt of nasty comments and jokes." Aplt. Br. at 36. As the Ninth Circuit specifically noted in *McAlindin*, however, "[m]ere trouble getting along with coworkers is not sufficient to show a substantial limitation." *McAlindin*, 192 F.3d at 1235. Unlike Mr. McAlindin, Mr. Steele has not provided any evidence that his OCD has caused him to have trouble getting along with people in general. Instead, Mr. Steele's difficulties seem to have been limited to the people he worked with. Like the plaintiff in *Soileau*, "the evidence does not establish that [he] had particular difficulty in interacting with others, except for [certain co-workers]." *Soileau*, 105 F.3d at 15.

We need not decide today whether this circuit will recognize interacting with others as a major life activity under the ADA, because Mr. Steele has not met the burden that would be required of plaintiffs if we were to so hold. The *McAlindin* court held that in order to demonstrate a plaintiff's major life activity of interacting with others was substantially affected, "a plaintiff must show that his 'relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary." *McAlindin*, 192 F.3d at 1235 (quoting

*EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities* (March 25, 1997) at 5).[4]   On the record before us, Mr. Steele has not made out a case that would satisfy this test.

## C.    *Was Mr. Steele regarded as disabled?*

The ADA recognizes that some persons who are not disabled will nonetheless have claims under the ADA if they can establish they were "regarded as" disabled.  The EEOC regulations give guidance on what courts should consider in making this determination.  The regulations provide three scenarios under which a plaintiff can be deemed disabled:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
> (3) Has none of the impairments defined in . . . of this section but is treated by a covered entity as having a substantially limiting impairment.

29 CFR § 1630.2(l).

Cases in this area often involve situations where a person is considered by an employer to be disabled and limited in the activities or jobs that person may

---

[4]We reiterate what this Court has noted before, that "[w]hile the EEOC's guidance may be entitled to some consideration in our analysis, it does not carry the force of law and is not entitled to any special deference." *Pack*, 166 F.3d at 1305 n.5; *Sutton v. United Air Lines*, 130 F.3d 893, 899 n.3 (10th Cir. 1997).

perform. We have held that "in order to establish a disability under the 'regarded as' prong of the ADA with respect to the major life activity of working, an individual must show that the employer regarded him or her as being substantially limited in performing either a class of jobs or a broad range of jobs in various classes." *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 904 (10th Cir. 1997), *aff'd*, 527 U.S. 471 (1999). The district court applied these standards to Mr. Steele's claims and held "the undisputed facts show that Steele performed all of his work assignments satisfactorily, received at least three promotions, and was never precluded from performing duties expected of co-workers." App. at 65-66.

Mr. Steele does not argue on appeal that his major life activity of working was affected. Rather, he appears to contend that because he was "regarded as" disabled by Thiokol and its employees, his major life activities of sleeping, walking, and getting along with others were substantially limited. In order to prevail under this section, Mr. Steele must establish that those major life activities were affected in one of the three ways provided for in the EEOC regulations cited above. To meet this burden, he relies solely on the fact that Thiokol was aware of his disability and the medications he was taking, and that one of his supervisors evinced concern about his mood swings and asked the company nurse if these mood swings could be a side effect of Mr. Steele's medication. This falls far short of raising a triable issue that Mr. Steele was

regarded by his employer as being substantially limited in his ability to sleep, walk, or interact with others as a result. *See Cody v. Cigna Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998); 29 CFR § 1630.2(1)(1), (3) ("an employer's request for a mental evaluation . . . is not equivalent to treatment of the employee as though she were substantially impaired.")

We **AFFIRM** the judgment of the district court holding that Mr. Steele did not establish a sufficient case under the ADA to survive summary judgment.