**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 18 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

LEROY GLOVER, JR.,

      Plaintiff-Appellant,

v.

NMC HOMECARE, INC., a Delaware
corporation, d/b/a Fresenius Medical
Care North America,

      Defendant-Appellee.

No. 00-3266
(D. Kan.)
(D.Ct. No. 98-CV-2477)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HENRY,** Circuit Judge, and **HOLLOWAY** and **BRORBY**, Senior Circuit
Judges.

_____

      Mr. Glover appeals from the district court's grant of summary judgment in

favor of his former employer, NMC Homecare, Inc. ("NMC Homecare"). Mr.

Glover challenges the district court's decision on his claims of hostile work

environment in violation of 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), racial

---

[*] This order and judgment is not binding precedent except under the doctrines of
law of the case, _res judicata_ and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

discrimination in violation of Title VII and 42 U.S.C. § 1981 ("Section 1981"), and "whistleblower" retaliatory discharge in violation of Kansas state law.[1] We have jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

BACKGROUND

From September 1996 until his termination in May 1998, Mr. Glover worked for NMC Homecare in its Billing Center in Lenexa, Kansas ("Kansas Billing Center"). The Kansas Billing Center billed and collected for the services provided by the NMC Homecare Renal Support Centers ("Renal Support Centers"). NMC Homecare had five Renal Support Centers located in: (1) Merriam, Kansas; (2) Anaheim, California; (3) Charlotte, North Carolina; (4) Houston, Texas; and (5) Monroe, Louisiana. The Renal Support Centers accepted call-ins for prescription medications, verified insurance information, completed portions of paperwork and mixed patient's prescriptions.

NMC Homecare hired Mr. Glover, an African-American male, in September 1996, as one of two "team leaders" in the Kansas Billing Center. When he was

_____

[1] Mr. Glover does not appeal, and we do not address, the district court's grant of summary judgment in favor of NMC Homecare on Mr. Glover's claims of intentional infliction of emotional distress and disability discrimination.

-2-

hired, the teams were organized based on the type of therapy billed. One team billed for Intra-Dialytic Parenteral Nutrition Therapy, a nutrition supplement for individuals with end stage renal disease, and the other team billed for Homecare Services. By the spring and summer of 1997, following corporate changes, the teams were re-structured around the two separate computer billing systems used by the Kansas Billing Center. Mr. Glover supervised the team billing "System 36" accounts; Ms. Sarratt supervised the team billing "MESTA" accounts.

In April 1997, NMC Homecare promoted Dr. Schwebke, who was a manager of its pharmacy operations, to the position of Intra-Dialytic Parenteral Nutrition Director of Operations. She was responsible for the Renal Support Centers. Shortly thereafter, Ms. Allen, who was the Medicare Reimbursement manager and hired Mr. Glover, moved into the position of Kansas Billing Center manager. She reported to Mr. Roy, the Director of Finance. Mr. Glover continued to report directly to Ms. Allen.

In June 1997, Dr. Schwebke learned of a potential problem with the Charlotte, North Carolina Renal Support Center's completion of "certificates of medical necessity," a specific Medicare Program form describing a patient's medical condition. Dr. Schwebke immediately contacted the Corporate

Compliance Department to report the paperwork problem, and went to the Charlotte branch to investigate the situation. In July 1997, Mr. Glover independently discovered the same potential problem and reported it to individuals in the Kansas Billing Center's Homecare Division; he did not, however, disclose the problem to the Intra-Dialytic Parenteral Nutrition Division in which he worked. As a result of Mr. Glover's report ("July report"), the head of the Homecare Division knew about the potential problem before the head of the Intra-Dialytic Parenteral Nutrition Division. Ms. Allen subsequently told Mr. Glover that the head of the Division where Mr. Glover worked was upset that he learned of the problem after the head of the Homecare Division was notified. Mr. Glover, however, was not criticized in his annual performance evaluation for alerting the company to the potential problems with the certificates of medical necessity. Ms. Allen did note in his evaluation that he "needs to be aware of the chain of command for our division." In the summer of 1997, NMC Homecare conducted an investigation related to the altered certificates of medical necessity.

In August 1997, Dr. Schwebke assumed responsibility for the Kansas Billing Center, and Ms. Allen began reporting to Dr. Schwebke. Shortly thereafter, NMC Homecare hired Mr. Turpin to work as financial services manager, a non-supervisory position, based out of St. Petersburg, Florida. In

November 1997, the Kansas Billing Center teams were again reorganized and structured into a "market-centered concept." The reorganization was intended to increase NMC Homecare's collections and efficiency. Under the "market centered concept," the patient account representatives ("collectors") were divided into three teams, each team assigned to bill and collect for a particular Renal Support Center.[2] All the teams reported directly to Ms. Allen.

Pursuant to this reorganization, NMC Homecare eliminated Mr. Glover's and Ms. Sarratt's team leader positions and reassigned them to new, non-supervisory positions. Mr. Glover was "demoted" to the position of "Critical Accounts Specialist" to collect difficult Medicare accounts contained in the computer billing system "System 36."[3] Mr. Glover was not trained on the "MESTA" billing system. Ms. Sarratt, the other former team leader, was reassigned to the newly created position of Senior Patient Account

---

[2] Prior to the November 1997 reorganization of the Kansas Billing Center, only three of the five Renal Support Centers remained.

[3] Mr. Glover claims his reassignment was a demotion because he was isolated, no longer supervised other employees and shared the same responsibilities as the employees he formerly supervised. NMC Homecare contends he was transferred to a lateral position because his income and benefits did not change. Because we view the evidence in the light most favorable to Mr. Glover, the non-moving party, we assume, without deciding, his new position was a demotion.

Representative.

In the first week of December 1997, Mr. Glover told a co-worker that he was twice sexually harassed by Mr. Turpin when he went to Mr. Turpin's hotel room after work to discuss business. According to Mr. Glover, Mr. Turpin physically touched him, watched him urinate, and made sexually suggestive remarks. Glover resisted Mr. Turpin's sexual advances.

After Mr. Glover told his co-worker about the sexual harassment, the co-worker notified Dr. Schwebke. Dr. Schwebke reported the allegations to the Corporate Human Resource Department ("Resource Department"). The Resource Department directed Dr. Schwebke to ask Mr. Glover to document his allegations in writing. Within a few days, Mr. Glover submitted two written accounts of the incidents, which Dr. Schwebke then forwarded to the Resource Department. After receiving Mr. Glover's written statements, individuals from the Resource Department interviewed Mr. Turpin, who denied Mr. Glover's allegations of sexual harassment. They also interviewed another potential witness to determine whether she could corroborate a telephone conversation Mr. Glover claimed he overheard while in Mr. Turpin's hotel room. The witness stated she did not have a telephone conversation with Mr. Turpin from his hotel room. The Resource

Department deemed the investigation "inconclusive" after it conducted these interviews and reviewed the receipts and expense reports from Mr. Turpin's hotel stay. Mr. Turpin was not terminated, but he was prohibited from having any future verbal or physical contact with Mr. Glover. Mr. Glover admits Mr. Turpin had no further verbal or physical contact with him after the investigation.

At various times throughout Mr. Glover's employment with NMC Homecare, and beginning as early as October 1996, Mr. Glover arrived late to work and returned late from lunch. In October 1996, Ms. Allen discussed with Mr. Glover that he was expected to arrive at work at a set time each day. Ms. Allen noted in Mr. Glover's annual performance evaluation that his "dependability" in arriving to work and meetings on time "need[ed] [i]mprovement."[4] Mr. Glover's attendance and punctuality problems did not abate, and NMC Homecare management repeatedly counseled and warned Mr. Glover about his excessive tardiness. On April 27, 1998, Ms. Allen issued Mr.

---

[4] "Needs Improvement" is defined as:

Does not fully meet job requirements and/or performance is not consistent. Improvement is necessary. The level of supervision required is higher than would be expected for the position. An improvement/correction plan should be in place. Approximately 5-10% of employees will be rated in this category.

Glover a written "Final Warning," and placed him on a three-month warning, or probationary, period. She explained the warning was issued because Mr. Glover used her office without her permission, behaved insubordinately, failed to perform his work as instructed, violated timecard and attendance policies, and used the fax machine for non-business purposes. Mr. Glover was on notice that his employment may be terminated if he failed to meet the terms of the warning during the three month probationary period, including no unexcused absences or tardiness.

Three days later, Ms. Allen sent a second written warning to Mr. Glover cautioning him that he had been late twice since she issued the first "Final Warning." She also noted two employees reported that Mr. Glover had removed and photocopied other employees' time cards. Ms. Allen concluded she would give Mr. Glover "one final chance, ... [but] [a]ny further problem of any kind with [his] performance or conduct will result in [his] immediate termination." On May 12, 1998, Ms. Allen terminated Mr. Glover because he was "late twice coming back from lunch in the same pay period after being warned twice in writing."

Mr. Glover sued NMC Homecare for hostile work environment sexual harassment, race discrimination, disability discrimination, whistleblower

retaliatory discharge and intentional infliction of emotional distress. The district court granted summary judgment in favor of NMC Homecare on all of Mr. Glover's claims. Relevant to this appeal, the district court concluded Mr. Turpin's alleged sexual misconduct involved isolated incidents, and were insufficient to support a claim of a hostile work environment. The district court held Mr. Glover's claim for race discrimination failed because he did not satisfy his *prima facie* case, and, even assuming *arguendo* that he did make this showing, Mr. Glover did not establish NMC Homecare's reasons for eliminating his team leader position and terminating him were pretextual. Finally, the district court reasoned summary judgment in favor of NMC Homecare on Mr. Glover's whistleblower retaliatory discharge was appropriate, in relevant part, because Mr. Glover failed to establish a *prima facie* case of retaliation and show NMC Homecare's reasons for discharging him were pretextual.

We review the grant of summary judgment *de novo*. *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1252 (10th Cir. 2001). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). Applying this standard, we view the

evidence and draw reasonable inferences from that evidence in the light most favorable to the nonmoving party. *Id.*

DISCUSSION

Mr. Glover challenges the district court's grant of summary judgment in favor of NMC Homecare on the following claims: (1) hostile work environment caused by sexual harassment in violation of Title VII; (2) race discrimination in violation of Title VII and Section 1981; and (3) whistleblower retaliatory discharge in violation of Kansas state law. We address each claim in turn.

*A. Hostile Work Environment*

Mr. Glover primarily argues the district court erroneously ruled on a basis not raised in NMC Homecare's motion and memorandum in support of summary judgment. The district court ruled there was insufficient evidence establishing a sexually hostile work environment; NMC Homecare argued there was no basis for employer liability because it effected prompt remedial measures to end the sexual harassment. Mr. Glover suggests he was "blind sided" by the district court because he responded to NMC Homecare's argument regarding employer liability, and not the existence of a sexually hostile work environment. In response to Mr. Glover's argument, NMC Homecare suggests the district court properly

considered and held Mr. Glover's uncontroverted written accounts submitted to Dr. Schwebke detailing Mr. Turpin's sexual harassment were insufficient as a matter of law to support a claim of a sexually hostile work environment. In the alternative, NMC Homecare argues, as it did in its memorandum in support of summary judgment, there is no basis for employer liability.

"To survive summary judgment under Title VII, the record must support an inference of a [sexually] hostile work environment *and* a basis for employer liability." *Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000) (emphasis in original). We resolve this claim based on the absence of employer liability, thereby making the issue of the presence of a hostile work environment immaterial to this appeal.[5] *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998); *see also Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1524 (10th Cir. 1997) ("[W]e are not constrained by the district court's conclusions, but may affirm the district court on any legal ground supported by the record.").

---

[5] Mr. Glover claims the district court implicitly found NMC Homecare's summary judgment argument unpersuasive and unsupported because the district court did not rule on that ground. Mr. Glover's argument has no impact on this court, however, because we review the district court's grant of summary judgment *de novo*. *Steele*, 241 F.3d at 1252.

An employer may be vicariously or directly liable for a hostile work environment created by its employee. *See Harrison v. Eddy Potash, Inc.*, 158 F.3d 1371, 1376 (10th Cir. 1998); *see also Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001). An employer may be vicariously liable when the "supervisor's harassment involves misuse of actual power." *Harrison*, 158 F.3d at 1376 (noting it is the "usual case" that a supervisor misuses actual authority) (quotation marks and citation omitted). In addition, an employer may be vicariously liable when the harassing employee acts with apparent authority. Under this theory, plaintiff must allege "'there is a false impression that the actor was a supervisor, when he in fact was not, [and] the victim's mistaken conclusion [was] a reasonable one.'" *Id.* (quoting *Burlington Indus. Inc, v. Ellerth*, 524 U.S. 742, 759 (1998)) (recognizing liability under apparent authority is "the unusual case"). Finally, under a negligence theory, an employer may be directly liable if it fails to remedy or prevent a hostile work environment of which management-level employees knew or should have known. *See Adler*, 144 F.3d at 673.

In this instance, Mr. Glover suggests NMC Homecare should be held vicariously liable for the sexually hostile work environment, pursuant to the "actual" or "apparent" authority theory. In contrast, NMC Homecare suggests negligence is the appropriate theory of liability, and, under this theory, Mr.

Glover did not show NMC Homecare failed to remedy the hostile work environment. We examine all three bases in order to determine whether NMC Homecare is liable for a sexually hostile work environment.

*1. Vicarious Liability*

Mr. Glover argues in his response memorandum to NMC Homecare's motion for summary judgment that Mr. Turpin possessed either "real" or "apparent" supervisory authority. Mr. Glover submits this argument despite a stipulated fact to the contrary in the pretrial order, which the court issued after the completion of discovery. The stipulation states, in relevant part, "in August or September 1997, [NMC Homecare] hired Randy Turpin into the position of Financial Services Manager, *a non-supervisory position*, based out of St. Petersburg, Florida." (Emphasis added.) Moreover, the pretrial order listed as an unresolved factual issue, the question of whether NMC Homecare was negligent. The pretrial order did not identify the nature of Mr. Turpin's authority as an unresolved issue.

Under these circumstances, we hold the parties' factual stipulation is clear and unambiguous, "is neither improvident nor would it work a manifest injustice," and is conclusive that Mr. Turpin lacked actual and apparent supervisory

-13-

authority.[6] *L.P.S. v. Lamm*, 708 F.2d 537, 539-40 (10th Cir. 1983) ("This court is ... reluctant to relieve parties from the benefits, or detriments, of their stipulations. We note that it is not our function to review the content of the stipulations to decide their relative worth."); *see also* Fed. R. Civ. P. 16(e). Accordingly, NMC Homecare is not vicariously liable.

*2. Negligence Liability*

Having concluded NMC Homecare is not vicariously liable for a sexually hostile work environment on an actual or apparent authority theory, we consider whether it is directly liable under a negligence theory. To determine whether an employer is liable for negligence in allowing employees to engage in sexual harassment, courts make two inquiries: "first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively

---

[6] We note it is the general rule that courts deem stipulations of fact as conclusive without additional evidentiary support in the record, "absent circumstances tending to negate a finding of informed and voluntary assent of a party to the agreement." *In re Durability Inc.*, 212 F.3d 551, 555 (10th Cir. 2000) (quotation marks and citation omitted). Whether relief from the stipulation should be granted or denied depends on when the relief was requested, and whether there are other overriding rules or policy considerations. *Id.* In this instance, Mr. Glover stipulated to the fact in the pretrial order after the completion of discovery, and failed to seek withdrawal of his stipulation. *Cf. id.* at 554-56.

known harassment." *Adler*, 144 F.3d at 673. NMC Homecare's knowledge is not at issue in this appeal; instead, we examine the adequacy of its remedial and preventative responses.

Mr. Glover advocates for the more stringent vicarious liability standard, and fails to rebut NMC Homecare's evidence establishing its conduct was not negligent. *See Hollins*, 238 F.3d at 1258. From the record before us, it is uncontroverted that Dr. Schwebke, upon learning of Mr. Glover's allegations, notified the Resource Department, collected Mr. Glover's written accounts and Mr. Turpin's expense reports, and forwarded this information to the Resource Department. The Resource Department then promptly interviewed Mr. Turpin and another potential witness, who both denied Mr. Glover's allegations. After reviewing the information and conducting the interviews, the Resource Department determined its investigation was inconclusive, but, nevertheless, prohibited Mr. Turpin from having any further verbal or physical contact with Mr. Glover. Mr. Glover admits Mr. Turpin had no contact with him after the investigation. In short, when NMC Homecare learned of Mr. Glover's harassment allegations, it immediately investigated and effectively stopped the harassing conduct. Based on these undisputed facts, we hold Mr. Glover failed to show a genuine issue of material fact whether NMC Homecare is negligently liable for

the alleged sexually hostile work environment.

We affirm the district court's grant of summary judgment in favor of NMC Homecare on Mr. Glover's hostile work environment claim albeit for reasons different than those relied upon by the district court.

*B. Racial Discrimination*

Mr. Glover relies on indirect evidence to support his claims of discriminatory demotion and discharge under Title VII and Section 1981. Pursuant to the *McDonnell Douglas* framework, the employee "must carry the initial burden under the statute of establishing a prima face case of racial discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) (quotation marks and citation omitted). Once the employee establishes a *prima facie* case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its employment action." *Id.* (quotation marks and citation omitted). If the employer satisfies its burden of production, the employee must then show that the employer's justification is pretextual – *i.e.*, unworthy of belief. *Id.* at 1226, 1230. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer

unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

*1. Prima Facie Case*

The district court held Mr. Glover failed to establish a *prima facie* case of disparate treatment regarding his demotion and termination. To establish a *prima facie* case of discriminatory demotion, Mr. Glover must show: (1) "that he was within a protected group, (2) adversely affected by defendant's employment decision, (3) qualified for the position at issue, and (4) that the job from which he was demoted was not eliminated." *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) (citation omitted). A *prima facie* case of discriminatory termination requires Mr. Glover to establish: "(1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge." *Kendrick*, 220 F.3d at 1229.[7]

_____

[7] Neither the parties nor the district court analyzed Mr. Glover's *prima facie* case under these standards. The district court evaluated whether Mr. Glover proved "similarly situated non-minority employees were treated differently," and relied on *Trujillo v. University of Colo. Health Sciences Ctr.*, in which we summarized a district court's *prima facie* requirement. 157 F.3d 1211, 1215 (10th Cir. 1998) ("The district court found that Plaintiff met his initial burden of establishing a prima facie case of racial discrimination by showing (1) that he is a member of a racial minority, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently."). It is doubtful Mr. Glover could establish a *prima facie* case of discriminatory demotion

-17-

## 2. *Legitimate, Nondiscriminatory Reason for Demotion and Discharge*

The burden shifts to NMC Homecare to provide a legitimate, nondiscriminatory reason for demoting and discharging Mr. Glover. NMC Homecare explains it demoted Mr. Glover to "Critical Accounts Specialist" because it reorganized the Kansas Billing Center and eliminated both team leaders' positions. NMC Homecare states it discharged Mr. Glover because he was consistently tardy after he was issued written warnings prohibiting such behavior. NMC Homecare therefore has articulated legitimate, nondiscriminatory reasons for demoting and terminating Mr. Glover.

## 3. *Pretext*

## a. *Demotion*

Mr. Glover argues he presented sufficient evidence demonstrating NMC Homecare's reasons for demoting him were pretextual. According to Mr. Glover, NMC Homecare's reorganization was "not justified," and its rationale for the restructuring, *i.e.*, to increase the company's efficiency and collections, is inconsistent with the fact that Mr. Glover's billing team had already dramatically

---

because his team leader job, like Ms. Sarratt's, was eliminated when the Kansas Billing Center was reorganized. However, for purposes of this appeal, we focus our analysis and disposition on Mr. Glover's argument that NMC Homecare's reasons for demoting and terminating are pretextual.

-18-

improved its collections. He points to NMC Homecare's abandonment of its restructuring efforts only two months after he was terminated, restoration of a team leader organization, and decision to promote Ms. Sarratt back to a supervisory position, as further evidence its decision to reorganize and demote him are unworthy of credence. Mr. Glover also opines, without factual support, his new position "would eventually work itself to an end" once he collected all the delinquent accounts, because NMC Homecare did not offer to retrain him on the "MESTA" computer billing system. In essence, Mr. Glover insinuates NMC Homecare's reorganization rationale is pretextual because the reorganization was economically unnecessary, quickly abandoned, and masterminded to isolate him from other employees and eventually eliminate his position.

Mr. Glover's conjecture the reorganization was not necessary fails to create a genuine issue of material fact that NMC Homecare's reasons for reorganizing and demoting him is pretextual. The record clearly shows NMC Homecare was undergoing and responding to corporate and management changes, and restructured its teams several times within a short time period. Mr. Glover's opinion and conclusory allegation the reorganization was not economically "justified" merely attempts to substitute his judgment, based on his limited knowledge of one billing team's improved collection efforts, for that of the

-19-

employers. *See L&M Enters., Inc. v. BEI Sensors & Sys. Co.,* 231 F.3d 1284, 1287 (10th Cir. 2000) ("Unsupported conclusory allegations ... do not create a genuine issue of fact.").

Mr. Glover's evidence that his team increased collections also does not show NMC Homecare's reasons for restructuring are unworthy of belief. Shortly after Dr. Schwebke assumed responsibility for the Kansas Billing Center, the reorganization was implemented to increase the company's overall efficiency and profitability. Dr. Schwebke and Ms. Allen believed the "market centered concept" would improve efficiency because it assigned one team from the Kansas Billing Center to one particular Renal Support Center, in order to eliminate previous confusion resulting from "try[ing] to figure out which [billing] system the patient was on." Ms. Allen also testified Mr. Glover was transferred to his new position to collect on difficult Medicare accounts worth over six million dollars, thereby increasing NMC Homecare's collections. As such, Mr. Glover's evidence casts no doubt on NMC Homecare's efficiency rationale, and merely questions the economic wisdom of its reorganization and restoration of a team leader system eight months later. We consistently recognize, however, courts "are not in the position of determining whether a business decision was good or bad. Title VII [and Section 1981 are] not violated by the exercise of erroneous or even

illogical business judgment." *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir. 1993) (citations omitted).

Similarly, Mr. Glover's supposition his job would end once he settled all the critical accounts, and his evidence that NMC Homecare never offered to retrain him on the "MESTA" computer billing system fails to evince pretext. Ms. Allen noted in Mr. Glover's annual performance evaluation that "[w]hen [MESTA] classes are available, he will be included in sessions for infusion." She testified that seats in the "MESTA" classes were oftentimes unavailable, and when there were available openings, the Intra-Dialytic Parenteral Nutrition Division used those seats for the "branch personnel because they had to key tickets in." Mr. Glover's work, unlike the branch personnel, did not require him to use the "MESTA" billing system. In fact, his new position required him to settle over six million dollars in uncollected accounts contained exclusively in the "System 36" billing system. Mr. Glover merely speculates he would not be given more assignments on the "System 36" billing system, or retrained on another billing system in the future. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) ("[M]ere conjecture that [the] employer's explanation is pretext ... is an insufficient basis for denial of summary judgment."). Workforce reorganizations implemented for the purpose of improving profits and efficiency,

and the training appropriate for an employee to achieve such results, are within the province of the employer's judgment. This court will not second guess such judgment. *See Kendrick*, 220 F.3d at 1233.

*b. Termination*

Mr. Glover also claims he provided sufficient evidence showing NMC Homecare's reasons for terminating him are pretextual. Mr. Glover raises two arguments: first, NMC Homecare should not monitor his tardiness, nor require him to use a timecard, because he is a salaried employee who performs his work and receives no overtime compensation; and second, he was disparately treated because he was terminated for tardiness, but Ms. Sarratt, who was also frequently tardy, was not discharged.

*(i) Salaried Employee*

Mr. Glover asserts NMC Homecare should neither be concerned with his tardiness, nor require him to use a timecard, because he is a salaried, non-hourly employee who does not receive overtime. Dr. Schwebke explained, however, that NMC Homecare experienced ongoing problems with salaried employees arriving to work late, leaving early, and taking extended lunches. NMC Homecare believed this behavior by salaried employees "set a bad example." As a result,

NMC Homecare expected all employees, except clinical reimbursement personnel, to time in and out. NMC Homecare presented overwhelming evidence its requirement that salaried employees use time cards and not be late was a legitimate business decision. Mr. Glover merely questions the sagacity of NMC Homecare's business practice. We conclude it is the employers' prerogative to deem punctuality imperative to business operations and to require employees, including salaried employees, to use time cards. This court is ill-suited to question such business judgment. *Kendrick*, 220 F.3d at 1233.

*(ii) Disparate Treatment*

Mr. Glover argues he was treated differently than Ms. Sarratt, who, according to Mr. Glover, was also repeatedly tardy but was not terminated. His only evidence of disparate treatment is an affidavit signed by Ms. Berg, a hourly, nonsupervisory employee working on Mr. Glover's billing team.[8] Ms. Berg's affidavit states, in relevant part:

> [D]uring the same period of time that Leroy Glover was being reprimanded by NMC Homecare for excessive tardiness, Sheila Sarratt, a similarly situated white employee, was equally, if not more

---

[8] The district court noted Mr. Glover failed to establish Jammie Berg was competent to testify about the comparative attendance and tardiness of Mr. Glover and Ms. Sarratt, and their respective discipline. Ms. Allen, in an affidavit, states Ms. Berg lacked responsibility for and authority to monitor the attendance of other employees.

tardy, or late, with regard to her coming to and leaving work, as well as leaving and returning from lunch. However, to affiant's knowledge, Sheila Sarratt was not reprimanded on the same basis as Leroy Glover, and Sheila Sarratt certainly was not terminated ....

That after Leroy Glover was terminated from his employment with NMC Homecare in May, 1998, the excessive tardiness of Sheila Sarratt became even greater than it was during the time period that Leroy Glover was still employed at NMC Homecare.... To my knowledge, she was not reprimanded by Judy Allen.

It is undisputed Ms. Berg was not responsible for disciplining employees and lacked access to the disciplinary records of NMC Homecare's employees.

An employee may "show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly situated, nonprotected employees *who violated work rules of comparable seriousness*." *Kendrick*, 220 F.3d at 1232 (emphasis added). "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline." *Id.* (quotation marks and citation omitted). In determining whether an employee is similarly situated to the plaintiff, "[a] court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *Id.* at 1232 (quotation marks and citation omitted). Trivial or accidental differences in treatment, or those explained by a nondiscriminatory motive, do not show the

employer's reasons for the adverse employment action are pretextual. *Id.*

Although Mr. Glover and Ms. Sarratt were tardy and each received a "Final Warning Notice," their employment circumstances are distinguishable in significant respects. *See id.* at 1233 (noting the persuasive value of the comparative evidence is diminished when the employer takes relatively severe disciplinary action against both employees). In Mr. Glover's case, three days after he received his "Final Warning Notice," Ms. Allen sent him a second written warning explaining that he had already been late two times since being placed on probation, and other employees saw him remove and photocopy their time cards. Less than two weeks after Mr. Glover received his second written warning, he was late twice returning from lunch. Ms. Sarratt's breach of NMC Homecare's tardiness rule is substantially different from Mr. Glover's transgressions. There is no evidence indicating Ms. Sarratt violated the terms of her "Final Warning," or was issued further written warnings.[9] In fact, Dr. Schwebke testified that after Ms. Sarratt received her warning, Ms. Sarratt "shaped up" and no longer had tardiness or absentee problems. Accordingly, Ms. Sarratt and Mr. Glover did not breach work rules of "comparable seriousness" because Ms. Sarratt's tardiness

---

[9] Assuming without deciding Ms. Berg's affidavit is admissible, she does not speak to whether Ms. Sarratt's tardiness continued after Ms. Sarratt received her written final warning.

ceased after receiving her warning, while Mr. Glover received multiple written warnings, violated the terms of his probation period, and, despite these warnings, returned late to work two times within a short time frame. *Id.* at 1233. "A company must be allowed to exercise its judgment in determining how severely it will discipline an employee for different types of conduct." *Id.* We conclude Mr. Glover's claim of disparate treatment fails to create a genuine issue of material fact that NMC Homecare's reason for terminating him is unworthy of belief.

Even viewing the evidence and construing reasonable inferences in the light most favorable to Mr. Glover, we hold Mr. Glover failed to show a genuine issue of material fact that NMC Homecare's reasons for demoting and terminating him are pretextual. We therefore affirm the district court's grant of summary judgment in favor of NMC Homecare on Mr. Glover's Title VII and Section 1981 race discrimination claims.

*C. Whistleblower Retaliatory Discharge*

Mr. Glover alleges he was discharged in retaliation for his July report of problems with the Charlotte, North Carolina Renal Support Center's completion of certificates of medical necessity. To show a *prima facie* case of whistleblowing under Kansas state law, an employee bears the burden of proving:

> [(1)] A reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; [(2)] the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and [(3)] the employee was discharged in retaliation for making the report.

*Palmer v. Brown,* 752 P.2d 685, 690 (Kan. 1988). To recover for retaliatory discharge, an employee must prove that the discharge was "based on" the employer's intent to retaliate, but employees are not obligated to show retaliation was the employer's "sole motive" for the termination. *See Brown v. United Methodist Homes for the Aged*, 815 P.2d 72, 88 (Kan. 1991) (worker's compensation claim); *see also Lierz v. Coca Cola Enters., Inc.*, 36 F. Supp. 2d 1295, 1301 (D. Kan. 1999) (whistleblower claim); *Ortega v. IBP, Inc.*, 874 P.2d 1188, 1194 (Kan. 1994) ("The basis of both workers compensation retaliation cases and whistle-blowing retaliation cases is the employer's bad motive in discharging the employee."). An employee must prove his whistleblowing claim "by a preponderance of the evidence ... [that is] clear and convincing in nature." *Lytle v. City of Haysville*, 138 F.3d 857, 869 (10th Cir. 1998) (noting the Kansas Supreme Court stated, "[w]e find no justification for applying different standards of proof in whistle-blowing and workers compensation retaliatory discharge cases") (quotation marks and citation omitted). Evidence "is clear if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable

and persuasive enough to cause the trier of facts to believe it." *Id.*

Mr. Glover claims NMC Homecare began retaliating against him in a series of adverse events culminating in his discharge because he made his July report to high ranking management employees at the Kansas Billing Center. We presume, although it is unclear from his appellate brief and his memorandum in response to NMC Homecare's motion for summary judgment, Mr. Glover believes the following evidence establishes his *prima facie* case of whistleblower retaliatory discharge: (1) he was "admonished" by Ms. Allen in his annual review for failing to obey the chain of command when he reported the potential problem with the certificate of medical necessity paperwork to managers outside his department; (2) a co-worker accused him of sexual harassment, and Ms. Allen was involved with the investigation of those allegations; (3) the Kansas Billing Center was reorganized and he was transferred to a new position; (4) Ms. Allen continued to reprimand and issue written warnings to him due to his tardiness; and (5) he was discharged.

Mr. Glover's annual performance evaluation is far from "clear and convincing" evidence that his termination eight months later, and ten months after his July report, was in retaliation for apprizing NMC Homecare management of

the paperwork problem in the Charlotte, North Carolina Renal Support Center. *See Lytle,* 138 F.3d at 869. Notably, the evaluation contained absolutely no criticism of the contents of Mr. Glover's disclosure, or for bringing the problem to the company's attention. Ms. Allen included one comment informing him that he needs to be cognizant of his division's "chain of command," but rated his overall "communication skills" as commendable.[10] Indeed, the evaluation form mandated Ms. Allen to consider whether Mr. Glover "[c]ommunicated information to *appropriate people* in a timely basis." (Emphasis added.) The evidence is not of a clear and convincing nature in Mr. Glover's favor because we can only speculate from his favorable evaluation what, if any, impact his July report had on his termination.

Mr. Glover's additional evidence also fails to establish his discharge was in

---

[10] Ms. Allen rated Mr. Glover's "communication skills" as "meets requirements." "Meets requirements" is defined as:

> Consistently meets and may occasionally exceed requirements. Levels of quality, quantity, job knowledge and overall performance consistently meet expectations to perform the job. Minimal supervision is required. In a high performance company such as ours it is expected that the vast majority of employees, 75-80%, will achieve this *commendable performance level*.

(Emphasis added.) Mr. Glover stipulated that he reported the paperwork problem to individuals in another Division of the Kansas Billing Center.

retaliation for making his July report to NMC Homecare management. The precise evidence Mr. Glover argues shows retaliation actually cuts against his claim. Ms. Allen's involvement in a co-worker's claim of sexual harassment against Mr. Glover does not suggest Ms. Allen retaliated against Mr. Glover for his July report. Ms. Allen merely investigated the claim, and, in fact, deemed the investigation "inconclusive." Furthermore, the reorganization of the entire Kansas Billing Center and the warnings he received for his undisputed tardiness fail to show, in a clear and convincing nature, that his termination was in any way connected to, let alone in retaliation for his July report. Accordingly, we hold Mr. Glover failed to establish a *prima facie* case of whistleblower retaliatory discharge under Kansas state law.

In sum, we **AFFIRM** the district court's grant of summary judgment in favor of NMC Homecare on Mr. Glover's claims of hostile work environment, racial discrimination and whistleblower retaliatory discharge.

**Entered by the Court:**

**WADE BRORBY**
United States Senior Circuit Judge
