NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1389
_____

CORRINA WEIDOW; KERRY BENTLER,

v.

SCRANTON SCHOOL DISTRICT

Corrina Weidow,
                                   Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-08-cv-01978)
District Judge:  Honorable A. Richard Caputo
_____

Submitted Under Third Circuit LAR 34.1(a)
January 13, 2012

Before:   McKEE, *Chief Judge,* FUENTES, and JORDAN, *Circuit Judges*.

(Filed: February 7, 2012)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Corrina Weidow appeals the grant of summary judgment in favor of the Scranton

School District (the "District") on her claims under the Rehabilitation Act, 29 U.S.C.

§ 794, and the Americans with Disabilities Act, 42 U.S.C. § 12131.  She alleged that the

District discriminated against her by failing to prevent her schoolmates from harassing her about the mental illness from which she suffers. Because we agree with the District Court that Weidow failed to adduce evidence sufficient to demonstrate that she has an impairment that substantially limits a major life activity, we will affirm.

## I. Background[1]

### A. *Factual History*

Weidow is a young woman with bipolar disorder and, as a result, has suffered at times from depression, confusion, difficulty in sustaining relationships, problems with sleeping, emotional hardship, and the inability to focus. Her mother, Kerry Bentler, testified that Weidow appeared to be a normal and happy child until the eighth grade, when she began to experience changes in her mood, excessive desire to sleep, and difficultly maintaining relationships with her peers at school. Unfortunately, those difficulties progressed that year and Weidow became self-destructive to the point of attempting suicide and cutting herself, so Bentler took Weidow to see Dr. Matthew Berger, a psychiatrist, who diagnosed her as having bipolar disorder. At the time of her diagnosis in May of 2004, Dr. Berger stated that Weidow had "limits [on] her function in cognitive, social, and occupational activities" but that her intelligence was not affected by the illness. (App. at 341.)

The following school year, in the fall of 2004, Weidow began her freshman year of high school at West Scranton High in the District. Bentler notified the school of

---

[1] Because we are reviewing a grant of summary judgment in Appellees' favor, we recount the facts in the light most favorable to the non-movant, Weidow. *See infra* note 4.

Weidow's illness upon enrollment. Weidow testified that, with the exception of confiding in her then-boyfriend and classmate, Jay Unger, she avoided discussion of her condition. Early in the school year, Weidow and Unger began to fight, and Unger eventually revealed her illness to others in the school. Unger's cousin, Mary Ann Hearne, was also a student at West Scranton High. Though she had previously been friendly with Weidow, Hearne began to harass her. As a result of that harassment, which included calling Weidow a "psycho," a "psychotic B-I-T-C-H," and "crazy" (App. at 52), and which escalated to threats against Weidow and her friends,[2] Hearne was expelled by the school. Soon thereafter, in January 2005, Weidow transferred to the Valley View School District for a short period before transferring to the North Pocono School District.

In the fall of 2005, Weidow returned to the Scranton School District and enrolled at Scranton High School. Unfortunately, Hearne was also enrolled at Scranton High School and began harassing Weidow again. Weidow notified school officials and Hearne was suspended and eventually stopped going to school. Meanwhile, Weidow's illness worsened; she suffered from heightened anxiety, feared for her life, became increasingly withdrawn, and, at one point, was found digging her fingernails into her arms until she bled. Nevertheless, Weidow completed the academic year at Scranton High and returned in the fall of 2006.

Upon her return, she had difficulties with a student named Erica Fox. Fox harassed Weidow, calling her "psychotic" and a "slut." (App. at 78.) The school had

---

[2] The harassment escalated to the point that Hearne threatened to "bash" Weidow's skull in, "kill" her, and "murder" her. (App. at 52, 56.)

conversations with Fox about her behavior, but she was not suspended or expelled. After consulting with Dr. Berger, Weidow left the school on homebound instruction in November 2006. She returned to Scranton High for her senior year in the fall of 2007, but, on her first day back at school, she had an argument with another student, Sandy Schultz, over an incident between the two that had occurred over the summer. Schultz shouted obscenities at Weidow and threatened to harm her. Weidow reverted to homebound instruction after the second day of her senior year and graduated from high school in 2008.

Weidow continues to receive treatment from Dr. Berger and deals with the challenges of her illness. After graduating from high school, she enrolled in Lackawanna College before transferring to Marywood University.

B.     *Procedural History*

In October 2008, Weidow filed an action against the District alleging, among other things, claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, and the Rehabilitation Act, 29 U.S.C. § 794. The District moved for summary judgment on all counts and the District Court granted that motion.

With respect to the ADA and Rehabilitation Act claims, the Court held that, though Weidow had been diagnosed with bipolar disorder, the facts failed to demonstrate that her impairment "prevents or severely restricts [her] from doing activities that are of central importance to most people's daily lives" as required to sustain such claims. (App. at 9 (quoting *Emory v. AstraZeneca Pharm. LP*, 401 F.3d 174, 180 (3d Cir. 2005).) The Court reviewed each of the major life activities that Weidow alleged were prevented or

4

severely restricted by her bipolar disorder, namely, interacting with others, caring for herself, concentrating, and sleeping.

The District Court concluded that, whatever the limitations on Weidow's ability to interact with others may have been, they were caused by the harassment she experienced at school, rather than her bipolar disorder. While some of the taunts and threats directed at Weidow certainly related to her disorder, the Court said that the genesis of the harassment was conflicts about boys. More importantly, the Court further concluded that Weidow's limitations in interacting with others were not severe since she testified that she "always had some friends" and "had a lot of acquaintances" that she "hang[s] out with." (App. at 12 (citations omitted).)

The District Court also noted that, while Weidow did describe some limitations on her ability to care for herself, she did not provide evidence that those limitations were severe. She had, rather, described those limitations – including excessive sleep, self-mutilating behavior, and feelings of worthlessness – as transitory and easing when harassment from her peers abated. While Weidow's incidents of self-mutilation were obviously troubling, the District Court decided that they were not sufficient for a reasonable jury to find a substantial limitation on her ability to care for herself, given the lack of evidence regarding the severity, duration, or frequency of those incidents.

In terms of Weidow's allegation that her impairment substantially limited her ability to concentrate, the District Court observed that what was said of Weidow's inability to focus indicated that the problem was, again, a product of the harassment she

5

experienced at school. The Court also concluded that the evidence was insufficient to demonstrate a significant restriction on a major life activity.

Finally, the Court said that the evidence of limitations on Weidow's ability to sleep was insufficient to create a triable issue of fact since that evidence, including a report by Dr. Berger that Weidow presented with "sleep disturbance" at the time of her diagnosis, could not lead to the conclusion that she was substantially limited in her ability to sleep. (App. at 15.)

Given that the evidence did not create a triable issue of fact with respect to whether Weidow had a disability that substantially limited a major life activity, the District Court entered summary judgment in favor of the District, without considering whether the District had discriminated against her.[3]

## II.    Discussion[4]

Weidow appeals the grant of summary judgment with respect to her ADA and Rehabilitation Act claims. Both the ADA and Rehabilitation Act prohibit certain

---

[3] The District Court also granted summary judgment in favor of the District on a 14th Amendment claim. Weidow does not appeal that issue.

[4] The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of an order granting summary judgment is plenary. *Curley v. Klem*, 298 F.3d 271, 276 (3d Cir. 2002). "A grant of summary judgment is appropriate where the moving party has established that there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 266 (3d Cir. 2005) (internal quotation marks omitted).

disability-based discrimination.[5]  Because "Congress has *directed* [that the ADA] be interpreted in a manner consistent with [the Rehabilitation Act]," we will consider her claims under those statutes together.  *Yeskey v. Commonwealth of Pa. Dep't of Corr.*, 118 F.3d 168, 170 (3d Cir. 1997); *see* 42 U.S.C. §§ 12134(b), 12201(a).

To make out a prima facie claim for discrimination under the ADA or Rehabilitation Act, the plaintiff must establish that she has a disability, that she is otherwise qualified to participate in the services, programs, and activities of the school, and that she was subjected to discrimination because of her disability.[6]  *Cf. Andrew M. v. Del. Cnty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007) (applying the Rehabilitation Act and citing *Ridgewood Bd. of Ed. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1997), *superseded by statute on other grounds*, 20 U.S.C. § 1415(f)(3)(C), *as recognized in P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 730 (3d Cir. 2009)).  In order to establish the disability element of an

---

[5] The Rehabilitation Act specifically provides that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance … ."  29 U.S.C. § 794(a).
   The relevant section of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C § 12132.

[6] The Rehabilitation Act was passed prior to the ADA, but the ADA is broader in that, while the Rehabilitation Act applies only to programs receiving federal funding, the ADA applies to all state and local government activities.  *Yeskey*, 118 F.3d at 170.  Thus, a claim under the Rehabilitation Act includes the additional element of showing that the school received federal financial assistance.  *Andrew M.*, 490 F.3d at 350.

ADA or Rehabilitation Act claim, a plaintiff must show that she has "a physical or mental impairment that substantially limits one or more major life activities … ."[7] 42 U.S.C. §12102(1)(A); 29 U.S.C. § 705(20)(B). Major life activities, in turn, "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). Other Courts of Appeal have held that interacting with others is a major life activity, *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 201-02 (2nd Cir. 2004); *McAlindin v. Cnty. of San Diego*, 192 F.3d 1226, 1235 (9th Cir. 1999), *amended by* 201 F.3d 1211 (9th Cir. 2000), and, for purposes of this appeal, we assume, without deciding, that it is. A substantial limitation means that the plaintiff is

> unable to perform a major life activity that the average person
> in the general population can perform; or [is] significantly
> restricted as to the condition, manner or duration under which
> an individual can perform a particular major life activity as

---

[7] People who have a record of such impairments or are regarded as having such impairments also fit the definition of being "disabled." 42 U.S.C. §12102(1)(B) & (C). After this case was filed, amendments to the ADA impacting the definition of "disability" were enacted and have taken effect. *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 501 n.5 (3d Cir. 2010); *see* The ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110–325, 122 Stat. 3553. Every Court of Appeals to consider the issue has held that the ADAAA does not have retroactive effect, *Becerril v. Pima Cnty. Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009); *Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936, 942 (D.C. Cir. 2009); *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 35 n. 3 (1st Cir. 2009); *Milholland v. Sumner Cnty. Bd. of Educ.*, 569 F.3d 562, 565 (6th Cir. 2009); *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009); *Fredricksen v. United Parcel Serv. Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009). We agree with our sister circuits that the ADAAA does not have retroactive effect because the amendments provided that they "shall become effective on January 1, 2009," 122 Stat. at 3559, and because we do not apply statutes retroactively unless there is clear congressional intent for such a result, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

> compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195-96 (2002) (quoting 29 C.F.R. § 1630.2(j)) (internal quotation marks and alterations omitted).[8]

It is undisputed that Weidow's bipolar disorder constitutes a physical or mental impairment. We thus turn to the question of whether that disorder substantially limits one or more of her major life activities. 42 U.S.C. § 12102. Although interacting with others, caring for oneself, concentrating, and sleeping, are major life activities, we agree with the District Court that, even viewing the evidence in the light most favorable to Weidow, the record here fails to show that the limitations Weidow described "substantially limit" her ability to interact with others, care for herself, concentrate, and sleep.[9]

Weidow urges that evidence of substantial limitations on major life activities can be found at the point when Dr. Berger diagnosed Weidow and stated that her symptoms included "sadness, depression, crying spells, feeling helpless and hopeless, experiencing poor motivation, ruminating thoughts, … variable appetite, sleep disturbance[, and] poor energy." (App. at 337.) However, that account of symptoms provides no information

---

[8] As noted earlier, we recognize that some of the standards articulated in *Toyota* have been altered by the ADAAA but we are obliged to apply the prior definition of disability in this case. *See supra* note 7.

[9] The District Court also determined that the limitations she experienced were not a function of her impairment but rather were a result of social tensions. Since we agree that the limitations were not shown to be severe, we do not consider what the source of the limitations may have been.

regarding frequency, severity, or permanency and thus cannot support a conclusion that she was significantly restricted in a major life activity.

Regarding her social interactions, there does not appear to have been a substantial limitation. Although she has been under the care of a psychiatrist and, sadly, has experienced episodes of self-destructive behavior, Weidow nevertheless, by her own admission, has always had some friends and socialized with many acquaintances. The record further reflects that, instead of being widespread, the difficulties she had in interacting with others were specific to certain girls in her high school class. With respect to caring for herself, Weidow provides no evidence to show that she was unable to appropriately manage tasks such as dressing, grooming, driving, or other daily chores. In terms of her difficulties concentrating and sleeping, Weidow again fails to provide evidence of severity, frequency, or duration. Indeed, that she successfully completed high school and went onto college speaks very well of her and reflects that she was not severely restricted.

We recognize that bipolar disorder is a serious illness and that it can certainly be of such severity that it substantially limits major life activities. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 302 (3d Cir. 1999) (reversing the grant of summary judgment in favor of the defendant school district on an ADA claim because "there [were] genuine factual disputes requiring a trial on whether [the plaintiff's] bipolar disorder substantially limits a major life activity"). By our decision today, we do not intend in any way to minimize the suffering and challenges faced by those who, like Ms. Weidow, live with this disorder. We are faced solely with the question of whether the evidence she adduced

10

was sufficient for a reasonable jury to decide in her case that, during her years attending schools in the District, she was substantially limited in a major life activity. The District Court rightly concluded that it was not.

## III. Conclusions

For the forgoing reasons we will affirm the judgment of the District Court.