**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MATTHEW WEAVING,
          *Plaintiff-Appellee*,

v.

CITY OF HILLSBORO,
          *Defendant-Appellant*.

No. 12-35726

D.C. No.
3:10-cv-01432-HZ

OPINION

Appeal from the United States District Court
for the District of Oregon
Marco A. Hernandez, District Judge, Presiding

Argued and Submitted
October 9, 2013—Portland, Oregon

Filed August 15, 2014

Before: Barry G. Silverman, William A. Fletcher,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge W. Fletcher;
Dissent by Judge Callahan

# SUMMARY[*]

## Americans with Disabilities Act

The panel reversed the district court's judgment, after a jury trial, in favor of a police officer who alleged that he was terminated in violation of the Americans with Disabilities Act.

The officer contended that he was disabled because his attention deficit hyperactivity disorder substantially limited his ability to engage in the major life activities of working and interacting with others. He claimed that Hillsboro Police Department discharged him because of his disabilities in violation of the ADA.

The panel held that as a matter of law the jury could not have found that ADHD substantially limited the officer's ability to work or to interact with others within the meaning of the ADA. The panel held that given the absence of evidence that the officer's ADHD affected his ability to work, and in light of the strong evidence of his technical competence as a police officer, a jury could not reasonably have concluded that his ADHD substantially limited his ability to work. The panel also held that the officer's interpersonal problems did not amount to a substantial impairment of his ability to interact with others. Accordingly, based on the evidence presented, no reasonable jury could have found the officer disabled under the ADA.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel reversed the City of Hillsboro's motion for judgment as a matter of law and remanded the case to the district court.

Dissenting, Judge Callahan wrote that the majority failed to follow *McAlindin v. County of San Diego*, 192 F.3d 1226 (9th Cir. 1999), and that there was sufficient evidence to support the verdict based on the officer's ADHD substantially limiting his ability to interact with others.

## COUNSEL

Matthew Kalmanson (argued) and Janet Schroer, Hart Wagner LLP, Portland, Oregon, for Defendant-Appellant.

Jaime B. Goldberg (argued), Makler Lemoine & Goldberg PC, Portland, Oregon, for Plaintiff-Appellee.

## OPINION

W. FLETCHER, Circuit Judge:

We must decide whether, consistent with the Americans with Disabilities Act ("ADA"), an employer properly terminated an employee who had recurring interpersonal problems with his colleagues that were attributable to attention deficit hyperactivity disorder ("ADHD"). Plaintiff Matthew Weaving worked for the Hillsboro Police Department ("HPD") in Oregon from 2006 to 2009. HPD terminated Weaving's employment in 2009 following severe interpersonal problems between Weaving and other HPD employees. Weaving contends that these interpersonal

problems resulted from his ADHD. After his discharge, Weaving brought suit under the ADA. He contended that he was disabled because his ADHD substantially limited his ability to engage in two major life activities: working and interacting with others. He claimed that HPD had discharged him because of his disabilities in violation of the ADA.

The jury returned a general verdict for Weaving, finding that he was disabled and that the City of Hillsboro ("the City") had discharged him because of his disability. The City moved for judgment as a matter of law. It also moved for a new trial on the ground of improper jury instructions. The district court denied both motions, and the City appealed.

We reverse. We hold as a matter of law that the jury could not have found that ADHD substantially limited Weaving's ability to work or to interact with others within the meaning of the ADA.

## I. Background

The evidence presented at trial showed the following. In 1973, Weaving, then six years old, was diagnosed with "hyperkinetic activity," known today as ADHD. His pediatrician prescribed medication. Weaving stopped taking medication at age twelve because, as his mother explained to him, he seemed to have outgrown the symptoms of ADHD. He continued, however, to experience interpersonal problems throughout childhood and adolescence.

Weaving joined the Beaverton Police Department ("BPD") in Oregon as a police officer in July 1995. During the application process, he passed a battery of tests, including psychological and medical evaluations. Because he believed

ADHD no longer affected him, Weaving did not disclose or discuss his childhood diagnosis and medication. Weaving's evaluations during his employment at BPD described him as "[a]loof, abrasive, too outspoken at inappropriate times," "forcefully outspoken," "disgruntled," and "intimidating," but also stated that he "works well with co-workers" and was "friendly, helpful and hard working." Some of his supervisors noted that he "[h]ad difficulty working in a team environment."

In 2001, while employed by BPD, Weaving became a narcotics detective on an interagency team. He was removed from the team less than a year later because of "personality conflicts" with another officer. Weaving filed a grievance and was put back on the team in 2003. While still employed by BPD, due to ongoing difficulties with colleagues Weaving left the interagency narcotics team to join an FBI task force. Weaving later learned that an FBI agent had complained to BPD about "communication issues" with him. The agent had written a letter to the BPD Police Chief stating that Weaving was "[f]requently critical and vocal about his fellow investigators" and that he had an "overly aggressive style."

Weaving was hired by HPD in 2006. During the application process, Weaving disclosed what he described as the "intermittent interpersonal communication issues" he experienced at BPD. HPD offered Weaving provisional employment, contingent upon passing a psychological evaluation. Weaving disclosed his childhood history of ADHD but did not believe at that time that ADHD continued to affect him.

Weaving's first-year evaluation at HPD was generally positive. His supervisor, Lt. Jim Kelly, praised his

experience and knowledge.  Lt. Kelly wrote that he had seen Weaving conduct all his investigations in a "thorough, professional, and conscientious manner."  He wrote that Weaving "maintains pos[i]tive and respectful relationships with his teammates, his supervisors, and the community."  Lt. Kelly noted that "[a] few members of the Department have the misconception that Weaving is arrogant," but that neither he nor members of Weaving's patrol team had found this to be the case.

Weaving applied for a promotion to sergeant in 2007. The application process included a "psychological leadership assessment," conducted by an off-site psychologist. Weaving did not mention ADHD during the application process because he believed he had outgrown it.  The psychologist provided a six-page report in which he described Weaving as having a profile similar to individuals who "tend to be dominant in interpersonal relationships."  He described Weaving as "socially interactive" and engaging in "cooperative and outgoing" relationships with others.  He observed that Weaving "projects a comfortable social presence" and stated that Weaving "likely presents himself well in just about any type of social situation and is likely to participate with any social group."  He described Weaving as "poised in his presentation and articulate in answering the scenarios."

Weaving was promoted to sergeant in April 2007.  In his annual evaluation, covering the period from May 2007 through April 2008, Lt. Kelly wrote that Weaving's interactions with the public were professional and that he displayed empathy toward members of the public.  Lt. Kelly wrote that Weaving's communication style ("[d]irectness") came across to officers as "arrogant" and inspired fear, but

that he personally did not have difficulties with Weaving. Lt. Kelly wrote that Weaving was aware of his communication issues and seemed willing to try new approaches.

Weaving's interpersonal difficulties continued after Lt. Kelly's 2008 evaluation. One subordinate testified at trial that he found Weaving's responses to his questions "demeaning." Another subordinate testified that Weaving's responses to questions were "intimidating," making him "feel stupid and small." In May 2008, a fellow sergeant wrote an email to Weaving and two other officers complaining about the number of "unapproved reports" that had been waiting for him when he arrived for his shift on Sunday morning, and questioning an earlier shift's decision to tow two cars. Weaving replied in an email:

> Allow me to respond to your email that by the way is a "PUBLIC RECORD";
>
> . . . .
>
> I'll respond to the second part of your inquisitive email [the part about the two cars] with a metaphorical analogy. Envision a swimming pool with a deep end and a shallow end separated by a floating rope. . . .
>
> There are many more potential hazards in the deep end and a person would be foolish to venture there without the technical expertise, stamina and initiative to keep from drowning. There are countless people who are good swimmers but still remain in the shallow end for fear of the potential danger the deep end

>    harbors.     Still,   there   are   others   who
>    negligently and recklessly venture to the deep
>    end  without  any  technical  proficiency  and
>    tragically drown.  My recommendation to you
>    is that you remain in the shallow end where
>    you can splash around with the kids.
>
>        What really upsets me about your inquiry
>    is not the simple fact that you question my
>    judgment and knowledge but the manner in
>    which  you  have  done  so.   If  you  have  any
>    desire to discuss this incident further or any
>    other incident please do not do so in a public
>    record email, come and find me any day of the
>    week!  I'm easy to locate, I'm in the deep end
>    so bring your water wings!

In  addition,  Weaving  referred  to  some  HPD  officers  in  a
derogatory  fashion,  calling  them  "salad  eaters,"  rather  than
"meat eaters" or "warriors," to imply that the officers were
weak.  He also criticized the language skills of a newly hired
Latino officer who did not speak English as his first language.

In  March  2009,  Weaving  issued  a  several-page
disciplinary letter to a subordinate who had driven a marked
police vehicle through a surveillance area.  At the time of the
incident,  Weaving  had  verbally  rebuked  the  officer  over  the
open   radio.     The   officer   believed   the   letter   was   a
disproportionate response to what he had done.  He filed a
grievance against Weaving with the City Human Resources
Department.  On April 7, 2009, the City placed Weaving on
paid   administrative   leave   pending   investigation   of   the
grievance.

Weaving testified that, while he was on leave, it occurred to him that some of his interpersonal difficulties at HPD might have been due to ADHD. He met with a mental health nurse practitioner who prescribed him a low dose of medication and referred him to Dr. Gary Monkarsh, a clinical psychologist. Dr. Monkarsh concluded that Weaving suffered from adult ADHD. Dr. Monkarsh testified at trial that people with ADHD "have a hard time understanding their emotions, the emotions of others, the ability to regulate one's emotions and the emotions of others, the ability to empathize with others." He also testified that someone with Weaving's characteristics "could be an excellent police officer."

On May 7, 2009, Dr. Monkarsh sent a letter to the HPD Police Chief stating that he had diagnosed Weaving as having ADHD. A day later, Weaving wrote to the City Human Resources director informing her of Dr. Monkarsh's diagnosis and attaching his letter to the Police Chief. He wrote:

> My Psychologist . . . has advised me that he is confident that with sustained treatment I will eliminate communication issues that currently are being considered adverse to the work environment of the Hillsboro Police Department (HPD). . . .

> During my three years of service with HPD I have been told multiple times by several ranking members that my experience, leadership and knowledge are a tremendous asset. I'm excited about transforming an identified weak area into an area of strength

and becoming an even greater asset to the City of Hillsboro. I look forward to receiving the positive support from the City that other HPD employees, who are afflicted with a mental disorder or an addiction, receive.

Weaving requested "all reasonable accommodations," including reinstatement to his position as an active-duty sergeant.

On June 16, 2009, Lt. Richard Goerling wrote a memorandum summarizing the findings of the investigation of the grievance against Weaving. The investigation, conducted while Weaving was on leave, included interviews of 28 HPD employees. Lt. Goerling concluded that Weaving had "creat[ed] and foster[ed] a hostile work environment for his subordinates and peers; in particular, he has been described in terms such as tyrannical, unapproachable, non-communicative, belittling, demeaning, threatening, intimidating, arrogant and vindictive." He wrote, "In the short time Weaving has been employed at HPD, he has demonstrated time and again unacceptable interpersonal communication that suggests he does not possess adequate emotional intelligence to successfully work in a team environment, much less lead a team of police officers."

On Lt. Goerling's recommendation, the City conducted an independent medical evaluation and evaluated Weaving's fitness for duty. Two doctors found Weaving fit for duty despite his ADHD diagnosis. On November 24, 2009, the Deputy Chief of Police sent Weaving, through his attorney, a sixteen-page letter advising him of the City's intention to terminate his employment "unless you persuade me otherwise." The letter described in detail Weaving's

interpersonal problems and their effect on HPD.   After a hearing, the City terminated Weaving's employment effective December 11, 2009.

Weaving sued the City in federal district court under the ADA.  He alleged that (1) the City fired him because he had an impairment that limited his ability to work or interact with others, and (2) the City fired him because it regarded him as disabled.  The case was tried to a jury.  The City moved for judgment as a matter of law at the close of Weaving's case-in-chief.  The district court denied the motion.  The City renewed its motion at the close of all evidence.  The district court again denied the motion.

The district court instructed the jury that Weaving was disabled if he had a mental impairment that substantially limited one or more major life activities, including "interacting with others, working and communicating."  It also instructed the jury, over the City's objection, that "[c]onduct resulting from a disability is part of the disability and not a separate basis for termination."

The jury returned a verdict for Weaving, finding him disabled under the ADA.   It found that the City had terminated him because of his disability.  The jury awarded Weaving $75,000 in damages.  The district court awarded $232,143 in back pay, $330,807 in front pay, and $139,712 in attorney's fees.  The district court refused Weaving's request for reinstatement because of "hostility and antagonism between" Weaving and HPD.

The City filed a renewed motion for judgment as matter of law based on insufficient evidence to support the verdict, as well as a motion for a new trial based on an allegedly

erroneous jury instruction. The district court denied both motions. The City timely appealed.

We reverse the denial of the motion for judgment as a matter of law. We do not reach the denial of the motion for a new trial.

## II. Standard of Review

We review de novo a denial of a motion for judgment as a matter of law to determine whether substantial evidence supported the prevailing party's claims. *Erickson v. Pierce Cnty.*, 960 F.2d 801, 804 (9th Cir. 1992). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987). "It is error to deny a judgment [as a matter of law] when it is clear that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party." *Erickson*, 960 F.2d at 804.

## III. Discussion

The ADA forbids discrimination against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A disability is "a physical or mental impairment that substantially limits one or more major life activities of [the] individual [who claims the disability]," or "a record of such an impairment," or "being regarded as having such an impairment." *Id.* § 12102(1). The ADA provides a nonexhaustive list of "major life activities." Such activities include "caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A).

A 2008 amendment to the ADA provides, "The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *Id.* § 12102(4)(A). "The term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008." *Id.* § 12102(4)(B). Those findings and purposes specifically express Congress's view that prior Supreme Court and lower court cases, as well as Equal Employment Opportunity Commission ("EEOC") regulations, had given "substantially limits" an unduly narrow construction. ADA Amendments Act of 2008, § 2(a)(4)–(8), Pub. L. No. 110-325, 122 Stat. 3553, 3553. "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C). According to post-2008 regulations promulgated by the EEOC,

> An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

29 C.F.R. § 1630.2(j)(1)(ii). Determining whether an impairment is substantially limiting "requires an individualized assessment." *Id.* § 1630.2(j)(1)(iv).

Weaving contends that the evidence at trial shows that he is substantially limited in the major life activities of working and of interacting with others. We take these two activities in turn.

## A. Working

The ADA specifically lists working as a major life activity. *See* 42 U.S.C. § 12012(2)(A). Under our pre-2008 case law, in order to show a substantial limitation on his ability to work, a plaintiff had to establish that his impairment precluded working not only at a particular job, but also a class of jobs or a broad range of jobs in various classes. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999); *Holihan v. Lucky Stores, Inc.*, 87 F.3d 362, 366 (9th Cir. 1996). The plaintiff had to present specific evidence about relevant labor markets in order to avoid summary judgment on a claim that he was substantially limited in his ability to work. *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 795 (9th Cir. 2001); *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 540 (9th Cir. 1997).

The 2008 amendments to the ADA relaxed the standard for determining whether a plaintiff is substantially limited in engaging in a major life activity, but Weaving cannot satisfy even the lower standard under current law. The record does not contain substantial evidence showing that Weaving was limited in his ability to work compared to "most people in the general population." *See* 29 C.F.R. § 1630.2(j)(1)(ii). On the contrary, there is evidence showing that Weaving was in many respects a skilled police officer. Dr. Monkarsh and Weaving both testified that Weaving had developed compensatory mechanisms that helped him overcome ADHD's impediments and succeed in his career. Weaving's

supervisors recognized his knowledge and technical competence and selected him for high-level assignments. In 2007, before receiving any treatment for adult ADHD, he was promoted to sergeant. In 2009, a psychologist and a physician/psychiatrist both deemed Weaving fit for duty as a police officer.

The only evidence Weaving presents regarding ADHD's effects on his ability to work pertains to his interpersonal problems. He contends in his brief that "[t]he impairment of the major life activity of 'working' was derivative and resulted from the impairments of the major life activities of communication and interaction with others." We discuss in a moment the lack of evidence showing a substantial impairment of Weaving's ability to interact with others. Given the absence of evidence that Weaving's ADHD affected his ability to work, and in light of the strong evidence of Weaving's technical competence as a police officer, a jury could not reasonably have concluded that Weaving's ADHD substantially limited his ability to work.

## B. Interacting with Others

Weaving also argues that he is disabled because his ADHD substantially limits his ability to interact with others. Unlike many of our sister circuits, we have specifically recognized interacting with others as a major life activity. *Cf. Bodenstab v. Cnty. of Cook*, 569 F.3d 651, 656 (7th Cir. 2009) (assuming, without deciding, that interacting with others is a major life activity); *Heisler v. Metro. Council*, 339 F.3d 622, 628 (8th Cir. 2003) (same); *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1255 (10th Cir. 2001) (same); *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 15 (1st Cir. 1997) (assuming, "*dubitante*, that a colorable claim may be made

that 'ability to get along with others' is or may be . . . a major life activity under the ADA").

We wrote in *McAlindin v. County of San Diego*, 192 F.3d 1226 (9th Cir. 1999), that "[b]ecause interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of 'major life activity.'" *Id.* at 1234. There was evidence in *McAlindin* that the plaintiff suffered from panic attacks, "fear reaction[s]," and "communicative paralysis," which caused him to stay at home for at least twenty hours per day. *Id.* at 1235. We held that this evidence was enough to defeat the defendant's motion for summary judgment. *Id.* at 1235–36. However, we cautioned:

> Recognizing interacting with others as a major life activity of course does not mean that any cantankerous person will be deemed substantially limited in a major life activity. Mere trouble getting along with coworkers is not sufficient to show a substantial limitation. . . .
>
> In addition, the limitation must be severe . . . . We hold that a plaintiff must show that his "relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary."

*Id.* at 1235. In *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053 (9th Cir. 2005), we held that a plaintiff who "avoid[ed] crowds, stores, large family gatherings, and even doctor's

appointments," and who did not leave the house for weeks after losing his job, had offered sufficient evidence of disability to survive summary judgment. *Id.* at 1060–61.

The evidence in this case differs starkly from that in *McAlindin* and *Head*. The plaintiffs in those cases were so severely impaired that they were essentially housebound. McAlindin's doctor described him as "barely functional," and there was evidence that he "suffer[ed] from a total inability to communicate at times." *McAlindin*, 192 F.3d at 1235. Head avoided contact with others, even members of his family, and had difficulty even carrying on conversations over the telephone. *Head*, 413 F.3d at 1061.

The evidence at trial showed that Weaving has experienced recurring interpersonal problems throughout his professional life. Those problems have had significant repercussions on his career as a police officer, resulting, most recently, in the termination of his employment with HPD. But Weaving's interpersonal problems do not amount to a substantial impairment of his ability to interact with others within the meaning of the ADA. Weaving's ADHD may well have limited his ability to *get along* with others. But that is not the same as a substantial limitation on the ability to *interact* with others. *See McAlindin*, 192 F.3d at 1235; *see also Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 203 (2d Cir. 2004) (distinguishing "'getting along with others' (a normative or evaluative concept) and 'interacting with others' (which is essentially mechanical)").

In contrast to the plaintiffs in *McAlindin* and *Head*, Weaving was able to engage in normal social interactions. His interpersonal problems existed almost exclusively in his interactions with his peers and subordinates. He had little, if

any, difficulty comporting himself appropriately with his supervisors. A case like Weaving's is what we described in *McAlindin* as not giving rise to a disability claim. 192 F.3d at 1235; *see also Weidow v. Scranton Sch. Dist.*, 460 F. App'x 181, 185–86 (3d. Cir. 2012) (stating that, assuming that interacting with others was a major life activity, a plaintiff who failed to show that her condition caused her to have trouble getting along with people in general was not disabled because she was not substantially limited in her ability to interact with others); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1131 (10th Cir. 2003) (same); *Steele*, 241 F.3d at 1255 (same).

As we wrote in *McAlindin*, a "cantankerous person" who has "[m]ere trouble getting along with coworkers" is not disabled under the ADA. 192 F.3d at 1325; *see also EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities*, U.S. Equal Employment Opportunity Commission (March 25, 1997), http://www.eeoc.gov/policy/docs/psych.html ("Some unfriendliness with coworkers or a supervisor would not, standing alone, be sufficient to establish a substantial limitation in interacting with others."). One who is able to communicate with others, though his communications may at times be offensive, "inappropriate, ineffective, or unsuccessful," is not substantially limited in his ability to interact with others within the meaning of the ADA. *Jacques*, 386 F.3d at 203. To hold otherwise would be to expose to potential ADA liability employers who take adverse employment actions against ill-tempered employees who create a hostile workplace environment for their colleagues.

Conclusion

Based on the evidence presented in this case, no reasonable jury could have found Weaving disabled under the ADA. His ADHD did not substantially limit either his ability to work or to interact with others. The district court erred in denying the City's motion for judgment as a matter of law.

**REVERSED and REMANDED.**

CALLAHAN, Circuit Judge, dissenting:

A jury of Matthew Weaving's peers sat in a courtroom for four days. They observed and listened to his coworkers, his supervisors, his doctors, his wife, as well as Weaving, himself. After being properly instructed on the law of our circuit, they dutifully studied the evidence and deliberated for eight hours over the course of two days. They found that Weaving was disabled and that the City of Hillsboro fired him because of his disability in violation of the Americans with Disabilities Act ("ADA").

Now on appeal, the majority decides that it knows better. It reweighs the evidence on a cold record and issues its own diagnosis: Weaving isn't disabled, he's just a jerk. Therefore, the City was free to fire him. In the course of doing so, the majority usurps the jury's role and guts our controlling circuit precedent, *McAlindin v. County of San Diego*, 192 F.3d 1226 (9th Cir. 1999). Instead of following *McAlindin*, as it was bound to do, the majority abrogates *McAlindin* sub silentio and replaces our circuit's standards with those announced in

another circuit's patently incompatible decision, *Jacques v. DiMarzio, Inc.*, 386 F.3d 192 (2d Cir. 2004). I cannot concur.

I

The majority selectively reviews the evidence to cast Weaving in an unsympathetic light.[1] But there are two sides to every story and the one that the jury heard was more nuanced than the majority acknowledges.

The evidence showed that Weaving was diagnosed with ADHD as a child but had been led to believe that he had "outgrown" his symptoms.[2] As an adult, Weaving had a strong dedication to police work, and initially "was a strong performer" as a patrol officer who was promoted to sergeant over several others. However, he had difficulty in his jobs both at the Beaverton Police Department and the Hillsboro

---

[1] Significantly, the majority places undue emphasis on several incidents, such as the "water wings" email Weaving sent to a coworker. Weaving's supervisor took no issue with the email when Weaving sent it, and the supervisor initially said that he thought the email was "funny." Additionally, although Weaving occasionally used terms such as "meat eaters" and "salad eaters" to refer to his coworkers, those terms had been used in the local police culture for a long time and Weaving was not the only sergeant to use them. Similarly, Weaving's supervisor approved Weaving's lengthy reprimand of a subordinate who drove a marked police car through a surveillance area, which later became the basis for the subordinate's grievance against Weaving. Moreover, although a sergeant recalled Weaving disparaging the work of an officer who spoke English as a second language, that sergeant agreed that the report that Weaving was referring to was of "poor" quality.

[2] In fact, although ADHD behavior can evolve over time, ADHD is thought to be a "lifetime condition." *See ADHD: 'You don't outgrow it,'* Wash. Post, Dec. 17, 2013, at E5.

Police Department ("HPD"), particularly once he was promoted beyond patrolman. In particular, his coworkers said that: they would avoid interactions with him; he would engage in lengthy lectures in response to simple questions; he would send impulsive emails; he would "beat a dead horse"; he was "socially retarded"; he made them feel intimidated and demeaned; he lacked any awareness of the reactions of others; and that he was hard to approach.

Lieutenant Richard Goerling's investigation was critical to the City's decision to terminate Weaving. Goerling found that Weaving had difficulty interacting with subordinates, peers, supervisors, and informants throughout his career. Among other things, Goerling concluded that Weaving refused to accept responsibility for his behavior. Goerling also repeatedly suggested that Weaving was a bully and intimidated his coworkers. At trial, however, Goerling *admitted* on the stand that he was *biased* against Weaving and that his report contained numerous inaccuracies and omissions in what were represented as interviewees' direct quotations. Additionally, *none* of the City's witnesses actually suggested that Weaving had bullied or intentionally intimidated his coworkers.

Deputy Chief Chris Skinner adopted Goerling's characterization of Weaving as a "bully" and suggested that he was "hostile" in his letter advising Weaving of the City's decision to terminate Weaving's employment. Despite the fact that Weaving was found "fit for duty,"**[3]** Skinner concluded that Weaving was critically deficient in the area of

---

**[3]** The "fitness-for-duty" assessment came as a result of a psychiatrist and a psychologist concluding that Weaving's ADHD would not prevent him from returning to work as a police officer.

emotional intelligence. At trial, Skinner testified that Weaving's lack of emotional intelligence was the "foundation" of his decision. Skinner recognized that Weaving said that he had ADHD, but suggested that Weaving's recent diagnosis was inconsistent with his earlier statements indicating that he had outgrown his symptoms and found that it did not substantially limit him in any major life activity, including work as a law enforcement officer. Skinner thus concluded that Weaving was not disabled and, in any event, that HPD could not accommodate him by returning him to duty as a sergeant.

At trial, Weaving explained that although he was aware that he had a history of childhood problems with ADHD, he initially did not believe that he was affected by it as an adult and also "didn't want to be stigmatized as a police officer with a mental disorder."[4] Weaving's treating psychologist, Dr. Gary Monkarsh, testified that Weaving displayed "one of the clearest examples of adult ADHD I've ever encountered in my clinical practice in 25 years." Dr. Monkarsh's testimony suggested that much of Weaving's problematic behavior was attributable to his ADHD, and that it could be successfully treated with medication and therapy. Among other things, Weaving had been able to improve his weak emotional intelligence—a common symptom of those suffering from ADHD—through therapy. Dr. Monkarsh elaborated that there is a "big difference" between someone who is simply "a jerk" and someone who has ADHD.

---

[4] Indeed, the City's human resources director suggested that Weaving might prefer to resign after he notified the City that he had ADHD because the information would "get out" to other potential law enforcement employers.

Driven by his love of his profession, Weaving had been able to become a successful police officer by developing compensatory mechanisms, such as calendaring systems, that allowed him to prioritize his tasks and overcome some of the effects of his disability, like slow processing speed. Nonetheless, Weaving was "unable to self-regulate" some of the other symptoms of ADHD without therapy, including impulsiveness, "not seeming to listen when spoken to, . . . interrupting others, . . . difficulty waiting his turn, blurting out comments without having emotional intelligence, [and lack of] awareness of the effect that that communication would have on his other workers at the police department." ADHD thus impaired Weaving's major life activities, including his "work." Dr. Monkarsh also indicated that although Weaving's ability to articulate sounds was not impaired, his communication was impaired because of his lack of ability to speak with emotional intelligence.

Dr. Leslie Carter, an examining psychologist, agreed with Dr. Monkarsh's diagnosis. Dr. Carter explained that Weaving had difficulty with his visual processing speed, an ADHD symptom. Dr. Carter elaborated:

> [W]hat most people find is that they are inattentive to visual details, one thing that they have difficulty doing is paying attention to the facial expressions that people give. If they take—if a person takes more than 10 seconds to register facial expressions and respond to them, like processing speed, then they are thought to be out of sync or unempathetic to other people, and they don't feel right. And they—they make other people irritable, because they're not quick enough

with their responses, and they're not recognizing the other person's needs as quickly as they should.

Despite these diagnoses, based on a "file review" and without an actual examination, the City's expert testified that Weaving did not have ADHD.

In his closing argument, Weaving's counsel explained that he was substantially impaired in the major life activities of "interacting with others, working and communicating," and continued:

Communicate, well, what does that mean? Well, it means a lot of what Dr. Monkarsh said, about what Chief Skinner said. Those are emotional intelligence things about communicating. It means not being impulsive, not being impulsive, where these things are coming up over and over again, pushing those e-mail buttons, giving those 30-minute lectures over and over and over again. That's communicating.

The City argued that Weaving was not disabled.

The district court instructed the jury with the following variant of the model instruction:

Major life activities are the normal activities of living which a non-disabled person can do with little or no difficulty, such as caring for oneself, performing manual tasks, walking, sleeping, seeing, hearing,

speaking, breathing, learning, engaging in sexual relations, reproducing, interacting with others, working, and communicating.

A limitation is substantial if the disabled person is unable to perform the major activity or is significantly restricted in doing so, when compared to the average person in the general population.

Factors to consider in deciding whether a major life activity is substantially limited include:

(1) the nature and severity of the impairment;

(2) the duration or expected duration of the impairment; and

(3) the permanent or long-term impact of the impairment.

The jury found that Weaving had proven that he had a disability under the ADA, that the City failed to reasonably accommodate his disability, and that the City discharged him because of it. Nonetheless, the jury found that Weaving had not proven that he was regarded as having a disability. The district court subsequently awarded equitable relief in the form of significant back and front pay in light of Weaving's inability to find other employment and the court's finding that Weaving would not be rehired in law enforcement.

II

We review the district court's denial of a renewed motion for judgment as a matter of law de novo. *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014). Such a motion should be granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Id.* (citation omitted). In reviewing such a motion, we must scrutinize the entire evidentiary record and "draw all reasonable inferences in favor of the nonmoving party and 'disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Id.* at 1242–43 (citation omitted).

III

A

Weaving's claims were predicated on impairments in his ability to communicate, interact with others, and work. He contended that his disability substantially impaired his ability to communicate and interact with others. His alternative (unsuccessful) theory was that HPD perceived him as having a communication disability that prevented him from working as a police officer.

The ADA prohibits employers from discriminating against qualified individuals on the basis of a disability. 42 U.S.C. § 12112. A "disability" is "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1). An individual may establish coverage under the ADA based on an actual impairment, a record of having an impairment, or

being regarded as having an impairment. *Id.*; 29 C.F.R. § 1630.2(g)(2). Major life activities "include, but are not limited to . . . speaking . . . communicating, and working."[5] 42 U.S.C. § 12102(2)(A). The current version of the regulations, effective May 24, 2011, further indicates that major life activities "include, but are not limited to . . . communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i). Additionally, the ADA provides that: "The definition of disability . . . shall be construed in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A). Thus, mental impairments are covered in addition to physical impairments. 29 C.F.R. § 1630.2(g)(1)(i). Such impairments consist of "[a]ny mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation'), organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). ADHD qualifies as an "impairment" under the ADA. *See Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998).

There was sufficient evidence to support the verdict based on Weaving's ADHD substantially limiting his ability to interact with others. However characterized, the gist of Weaving's primary claim all along has been that he suffered from the type of impairment that we recognized in *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234–35 (9th Cir. 1999). In *McAlindin*, the plaintiff contended that he suffered from anxiety and panic disorders that would cause him to become "incapacitated" and force him to lie down "at least once a month." *Id.* at 1230–31, 1241. Among other things, during one stress-induced incident that precipitated his taking

---

[5] This suggests that "speaking" and "communicating" are distinct major life activities.

leave from work, he became agitated, accusatory, and shouted at a supervisor. *Id.* at 1231.

We reversed the district court's grant of summary judgment on the plaintiff's ADA claim. *Id.* at 1230. We recognized that a plaintiff with an "interacting with others" impairment could prevail "[b]ecause interacting with others is an essential, regular function, like walking and breathing."**[6]** *Id.* at 1234. Thus, we held that a plaintiff could prevail where he showed "that his 'relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary.'" *McAlindin*, 192 F.3d at 1235 (citation omitted). Summary judgment was inappropriate on the plaintiff's claim because the evidence indicated that he "suffer[ed] from a total inability to communicate at times, in addition to a more subtle impairment in engaging in meaningful discussion." *Id.* at 1235–36. We emphasized that the plaintiff's claims were supported by "clinical findings" and "medical evaluations." *Id.* at 1235.

In so holding, we disagreed with the First Circuit, which had found that "the 'ability to get along with others' was too vague to be a major life activity." *Id.* at 1234 (discussing *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 15 (1st Cir.

---

**[6]** *Accord Lemire v. Silva*, 104 F. Supp. 2d 80, 86–87 (D. Mass. 2000) ("Human beings are fundamentally social beings. The ability to interact with others is an inherent part of what it means to be human. Even if we had the capacity to live without any human interaction, that capacity is immaterial in view of the highly interactive society in which we live. The ability to interact is thus both fundamental in itself and also essential to contemporary life. Beyond doubt, the ability to interact is at least as basic and as significant as the ability to learn or to work.").

1997)). We noted that interacting with others was no more vague than many other recognized major life activities, such as "caring for oneself." *Id.* at 1234–35. Nonetheless, we also stated that merely being "cantankerous" or getting into "trouble" with coworkers was not sufficient to show a substantial limitation under the then-applicable ADA standards. *Id.* at 1235. The dissent criticized the "interacting with others" standard as "vague" and implying that "a person's foul temperament may no longer be a reason to deny that person a job." *Id.* at 1240.

In *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1056–57, 1060–61 (9th Cir. 2005), we reversed a grant of partial summary judgment on a similar ADA claim where the plaintiff suffered from the periodic inability to leave his house. He admitted that the behavior did not occur all the time, but asserted that it occurred "'many times' or 'most' of the time." *Id.* at 1061. Although recognizing that the plaintiff's impairment did not appear to be as severe as the plaintiff's in *McAlindin*, we found that it was sufficient to avoid summary judgment. *Id.* at 1060–61.

In contrast, in *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 200–04 (2d Cir. 2004), the Second Circuit *vacated* a jury verdict based on an instruction that tracked the *McAlindin* standard. It held that in order to satisfy the standard for an "interacting with others" impairment, a plaintiff must establish that "the impairment severely limits the plaintiff's ability to connect with others, i.e., to initiate contact with other people and respond to them, or to go among other people—at the most basic level of these activities." *Id.* at 203 (emphasis omitted). The court elaborated: "The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose

communication is inappropriate, ineffective, or unsuccessful." *Id.* In announcing this standard, the Second Circuit disparaged *McAlindin*, stating:

> While we accept the Ninth Circuit's premise that "interacting with others" is a "major life activity" under the ADA, we conclude that the Ninth Circuit's test for determining when a limitation on this activity is "substantial" for ADA purposes is unworkable, unbounded, and useless as guidance to employers, employees, judges, and juries. According to the Ninth Circuit—whose opinion in *McAlindin* the district court's jury instructions in this case tracked—a plaintiff's impairment in "interacting with others" is "substantial" for purposes of the ADA when it is "characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary," *McAlindin*, 192 F.3d at 1235, so that a mere "cantankerous[ness]," is not enough. *Id.*
>
> The Ninth Circuit's presumed demarcation—between persons who are "hostile" and those who are "cantankerous"—does not exist. . . . In a similar vein, the Ninth Circuit's phrase, "consistently high levels of social withdrawal," fails to capture the appropriate standard.

*Id.* at 202–03 (original ellipsis omitted). The court went on to suggest—as the dissent in *McAlindin* did—that the "Ninth Circuit approach" would frustrate "the maintenance of a civil workplace environment" by exposing employers to the risk of litigating hostile work environment claims by "unpleasant" employees.[7] *Id.* at 203.

The majority distinguishes *McAlindin* and *Head* by claiming that Weaving was "able to engage in normal social

---

[7] Contrary to the Second Circuit's criticisms, the *McAlindin* standard relies heavily on the existence of medical evidence to show a severe and regular impairment and does not simply give the ill-tempered free reign to cause havoc in the workplace. As one commentator explained:

> The *McAlindin* standard, whereby those demonstrating severe problems on a regular basis, such as "consistently high levels of hostility, social withdrawal or failure to communicate when necessary," strikes a good balance between frivolous and significant interacting with others claims. . . . Just as an individual in a wheelchair "may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run," an individual capable of interacting with others some of the time who nevertheless experiences significant difficulty in doing so likewise is substantially limited in the ability to interact with others. When applied diligently but not insurmountably to protect those who can demonstrate regular and severe difficulties communicating with others and interacting within appropriate social parameters, this standard should effectively negate the possibility of a floodgate of litigation.

Wendy F. Hensel, *Interacting with Others: A Major Life Activity Under the Americans with Disabilities Act?*, 2002 Wis. L. Rev. 1139, 1194 (citations and footnotes omitted).

interactions" and that the plaintiffs in those cases "were essentially housebound." Then, relying on the *Jacques* standard and channeling the *McAlindin* dissent, it holds that those who are capable of communicating but whose communications may be "inappropriate, ineffective, or unsuccessful" cannot prevail under the ADA because otherwise, employers would be exposed to liability in the form of actions by "ill-tempered employees who create a hostile workplace environment for their colleagues."

We, however, are compelled to construe the evidence in favor of the jury's verdict. *See Escriba*, 743 F.3d at 1242–43. Here, the evidence showed that Weaving was well beyond being merely cantankerous or troublesome. To the contrary, he had problems in his interactions with just about everyone throughout his career in law enforcement. Not only was he unable to engage in meaningful communication on a regular basis, but his ADHD made him seem unapproachable to his coworkers, thus completely precluding some interactions. Moreover, the majority's suggestion that Weaving's "interpersonal problems" were limited to his interactions with peers and subordinates is dead wrong. HPD's own investigation repeatedly suggested otherwise.[8] His doctors explained that his disability caused the severe lack of emotional intelligence that the City invoked when it fired him—he was not simply being "a jerk" who refused to

---

[8] Goerling noted that supervisors regarded Weaving as "non-receptive to constructive criticism, self-satisfying, assuming," that Weaving filed "formal complaints against his supervisors," and Weaving seemed "to create . . . interpersonal conflict everywhere he was assigned." Skinner concluded that Weaving was unable "to work and communicate effectively with others in a team environment" given the "well documented impacts of [his] past interactions with subordinates, supervisors, and peers."

control himself.  The jury outright rejected the City's opposing argument that Weaving was not disabled.

Weaving's relations with others were undoubtedly characterized on a regular basis by severe problems including "high levels of hostility," "failure to communicate when necessary" due to his perceived unapproachability, and a constant inability to engage in "meaningful discussion."  *See McAlindin*, 192 F.3d at 1235.  That is sufficient to satisfy *McAlindin*, which by its own terms, did not limit relief to the "housebound."  Consequently, under the law of our circuit, the jury was entitled to conclude that Weaving's ADHD substantially limited his ability to interact with others.[9]

## B

The City argues that even if Weaving can prevail under his "interacting with others" theory, the verdict should be vacated and remanded for a new trial because he could not prevail under his inability to "work" theory.  Weaving's ADA claim was based on alternative predicates supporting one legal claim.  "When a general verdict may have rested on

---

[9] Even if I were to agree that the *Jacques* standard is preferable as a matter of policy, a three-judge panel cannot overrule *McAlindin* absent an intervening controlling authority to the contrary.  *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc).  No such authority exists.  Indeed, the only intervening authorities are the amendments to the ADA and regulations, which if anything, support a more expansive interpretation of the ADA.  *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(a)(4), 122 Stat. 3553 (2008) (amending the ADA to overrule Supreme Court decisions that had "narrowed the broad scope of protection intended to be afforded by the ADA."); 29 C.F.R. § 1630.2(i)(1)(i) (including "communicating" and "interacting with others" among the list of major life activities).

factual allegations unsupported by substantial evidence, we will uphold the verdict if the evidence is sufficient with respect to any of the allegations." *McCord v. Maguire*, 873 F.2d 1271, 1273–74 (9th Cir.) (finding that a general verdict on a single claim of medical negligence had to be upheld where it was undisputed that four of the alleged acts of negligence were supported by the evidence and the defendant failed to request a special verdict form, despite the fact that four other acts were disputed), *amended on other grounds*, 885 F.2d 650 (9th Cir. 1989). Accordingly, because Weaving satisfied the *McAlindin* standard, it does not matter whether he failed to establish that he had a work impairment.[10]

## IV

Not all disabilities are obvious. To a casual observer, Matthew Weaving may not appear to be disabled. But that doesn't give a panel of appellate judges license to brush away the contrary medical evidence and jury findings. Mental disabilities that cause socially unacceptable behavior are less obvious than physical disabilities, but the Americans with Disabilities Act protects those suffering from either form of disability equally.

The majority may not like Matthew Weaving—or at least the picture of him that it paints based on a cold record. But the outcomes of our disabled litigants' cases should not turn

---

[10] I would also hold that the district court did not err in giving the instruction providing that "[c]onduct resulting from a disability is part of the disability," which was fully consistent with our decisions in *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1093 (9th Cir. 2007), and *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001).

solely on the amount of sympathy they inspire. The law protects the disabled, not the likeable. *Cf. Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 854 (1992) ("[N]o judicial system could do society's work if it eyed each issue afresh in every case that raised it. Indeed, the very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable." (citations omitted)). Because the majority has gutted our controlling precedent and substituted its own factual findings for that of the jury, I respectfully dissent.